# United States Court of Appeals
## For the First Circuit

No. 06-2719

UNITED STATES OF AMERICA,

Appellee,

v.

WILFREDO FELICIANO RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Keenan, District Judge. *

Linda Backiel for appellant.
German A. Rieckehoff, Assistant United States Attorney, with whom Rosa Rodriquez Velez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief for appellee.

May 13, 2008

---

* The Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

**KEENAN**, **District Judge**. Appellant Wilfredo Feliciano Rodriguez ("Feliciano") was convicted after a jury trial for his participation in a multi-drug conspiracy that operated out of the Nuestra Senora de Covadonga public housing complex in Trujillo Alto, Puerto Rico ("Covadonga"), from 1998 through 2004. Feliciano challenges his conviction on the grounds that the cumulative effect of evidentiary errors deprived him of a fair trial and that the evidence presented at trial varied impermissibly from the allegations contained in the indictment. In addition, Feliciano challenges his sentence on the grounds that the district court imposed an unreasonable sentence; clearly erred in making findings regarding drug quantity and the brandishing of a firearm; imposed a sentence that was above the statutory maximum for the charge of conspiracy to possess weapons in furtherance of narcotics trafficking; and erroneously imposed consecutive sentences for two section 924(c) violations that were based on a single underlying drug conspiracy. For the following reasons, we affirm Appellant's convictions on Counts One, Two, and Six; vacate the conviction on Count Four; vacate the sentences on Counts Two and Six but not on Count One; and remand for re-sentencing on Counts Two and Six.

## BACKGROUND

Appellant was one of eleven co-defendants charged in a six-count superseding indictment (the "Indictment") returned on March 11, 2004 by a grand jury sitting in the District of Puerto

-2-

Rico. The Indictment charged Feliciano in four counts. Count One charged him with conspiracy to possess with intent to distribute five kilograms or more of cocaine, 50 grams or more of crack, one kilogram or more of heroin, and/or 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 846, and 860. Count Two charged him with conspiracy to use firearms in furtherance of the drug conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(o). Counts Four and Six each charged Feliciano with using and/or brandishing firearms in furtherance of a drug trafficking crime, respectively, on April 10, 2003 and April 19, 2003, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

Feliciano's co-defendants pleaded guilty and were eventually sentenced to terms ranging from 57 to 132 months. Feliciano opted to go to trial.

The Government's evidence of Feliciano's participation in the drug conspiracy at Covadonga consisted primarily of the testimony of Omar Medina, a cooperating co-conspirator who was a drug runner and seller at Covadonga; and the testimony of Oscar Espada, a government informant who was installed in a vacant apartment at Covadonga and directed by his police handlers to make secret videotape recordings of narcotics deals that took place at the drug point outside his building.

Medina's testimony established the following. Between 1998 and 2004, the Covadonga drug point operated as a thriving drug marketplace in which different dealers sold various brands, or lines, of crack, cocaine, heroin, and marijuana, with the organized assistance of runners and lookouts equipped with walkie-talkies. Feliciano, whom Medina knew since their childhood growing up together in the housing complex, began working in the drug trade at Covadonga in 1998, when he was a teenager. Feliciano assisted his brother-in-law, Bebe, in Bebe's operation of a drug point by sorting cocaine into bags and organizing the bags into quantities of one hundred, or "decks". Feliciano also acted as Bebe's runner, distributing cocaine and collecting the $5 in proceeds from the sale of each baggie. Feliciano served as a runner on a daily basis, delivering between 50 and 100 bags of cocaine, two or three times per eight hour shift.

Feliciano worked for Bebe from 1998 until 2002, when Bebe was murdered after a power struggle over control of the drug point. During this period, Medina also worked at the drug point as a seller and runner of marijuana, crack, cocaine, and heroin. Medina testified that, after Bebe's murder, an individual named Luis Osorio, a/k/a "Trumpi", assumed power over the drug point and was joined by Cristian Villegas, a/k/a "Casi". In April 2003, "Trumpi" was murdered, "Casi" was driven out of Covadonga, and Feliciano, along with Alex Trujillo, assumed control. Feliciano acted as a

leader, or owner, until his arrest on June 1, 2004. Trujillo went into hiding and, at the time of Feliciano's trial, remained a fugitive.

As the owner of a drug point, Feliciano employed various runners and sellers, including Medina, who sold bags of heroin and cocaine on Feliciano's behalf. Feliciano's heroin was distinguished from the heroin sold by other dealers at Covadonga by blue foil packaging, and his cocaine was distinguished by pictures of a little bus that were stamped onto the bags.

Medina testified that drug workers in Covadonga regularly carried weapons to protect their drug operations. Medina observed Feliciano carrying weapons at Covadonga several times in 2003. In addition, Feliciano authorized the distribution of and supplied weapons to his drug workers at Covadonga. Medina also testified that Feliciano himself fired an AR-15 rifle at "shady"-looking cars that passed through Covadonga.

Espada, a professional photographer who was in the witness protection program at the time that he agreed to work on the Government's behalf, testified about his installation at Covadonga, his infiltration of the drug ring, and the videotapes he made of numerous drug transactions that took place at the drug point that Appellant operated, which was located outside Espada's building. Espada surreptitiously videotaped the narcotics activity from his apartment window. Espada began making recordings upon his

arrival at Covadonga in October 2002 and stopped only in April 2003, when he fled Covadonga in the wake of "Trumpi"'s murder. Espada testified that he was mistakenly believed to be associated with "Casi" and "Trumpi" and that shots were fired at him.

The Government introduced into evidence 78 videotapes recorded by Espada. Feliciano appeared on four tapes made on four separate days: December 21 and 31, 2002 and April 10 and 19, 2003. The videotape of December 21, 2002 showed Feliciano delivering a package of cocaine to and receiving cash from an individual named "Junito", whom Medina identified as one of the sellers at the drug point. The December 31, 2002 videotape also showed Feliciano receiving money from a drug sale. The videotapes of April 10 and 19, 2003 corresponded to the overt acts charged in the Indictment in connection with the section 924(c) violations charged in Counts Four and Six and showed Appellant and his co-conspirators in possession of firearms. Espada also testified that he observed Feliciano on a number of occasions possess and distribute weapons and cocaine.

Medina was called on to describe the activity that was depicted on the videotapes and, in particular, to identify Feliciano. On the April 10 videotape, Medina identified Feliciano handing a pistol to an individual named "Siese", whom Medina described as the owner of a drug point in a housing complex outside of Covadonga. Also on the April 10 videotape, Medina identified

-6-

"Carli" Rojas, one of Feliciano's drug sellers, with a firearm in his waistband, which Medina said Rojas carried for protection. On the April 19 videotape, Medina identified Feliciano carrying a firearm in his hand in the company of three men whose functions Medina did not identify.

In addition to the testimonies of Medina and Espada, the Government offered at the outset of its case the testimony of Drug Enforcement Administration Agent Anthony Toro Zambrano ("Toro"), the lead agent on the case. Agent Toro was qualified as an expert in the operations of drug conspiracies and testified about the manner in which a drug point typically functions, including the hierarchy among leaders, sellers, enforcers, runners, and lookouts, and the manner in which different brands of drugs are typically packaged. Toro also testified about his seizure of drugs and drug paraphernalia from the Covadonga apartment of Alex Trujillo, the individual who Medina testified "took over" the Covadonga drug operation along with Feliciano. The drugs and paraphernalia seized by Toro displayed the markings of several different brands of narcotics that were sold by different drug owners at Covadonga.

After a ten-day trial, the jury found Feliciano guilty on all four counts. The jury also found by special verdict form that the drug conspiracy charged in Count One involved the threshold drug quantities charged in the Indictment. The district court sentenced Feliciano to concurrent sentences of life imprisonment on

Counts One and Two.  The court also imposed a sentence of seven years on Count Four, based on a finding of brandishing, and 25 years on Count Six, the mandatory minimum sentence for a second or subsequent conviction under section 924(c), with the sentences on Counts Four and Six to run consecutively to each other and to the life sentences in Counts One and Two.  Thus, Feliciano received cumulative sentences of life imprisonment plus 32 years.  This timely appeal followed.

**DISCUSSION**

*(I) Alleged Evidentiary Errors*

Feliciano claims that the cumulative effect of improperly introduced evidence deprived him of a fair trial.  The evidence to which he objects consisted of: (a) purportedly improper testimony of the lead agent, Agent Toro; (b) testimony regarding Medina's purchase of a rifle on behalf of Alex Trujillo; and (c) Espada's testimony about statements he heard from Feliciano's drug workers regarding Feliciano's status as a drug dealer at Covadonga.

We review adequately preserved objections to rulings admitting or excluding evidence for abuse of discretion. See United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006).  If there is error, "it is settled that a non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is highly probable that the error did not influence the verdict." United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005)

-8-

(internal quotations and modifications omitted). When the appellant did not assert a timely objection at trial, we review only for plain error. See id. at 86. The plain error standard requires this court to "find [1] that there is error [2] that is plain and [3] that affects substantial rights. When these three elements are satisfied, an appellate court may exercise its discretion to correct the error . . . only if the forfeited error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Epstein, 426 F.3d 431, 437 (1st Cir. 2005) (internal quotation marks and citation omitted)(alterations in original). "For the third prong, the defendant has the burden of showing prejudice or that the error 'affected the outcome of the district court proceedings.'" Id. (quoting United States v. Colon-Munoz, 192 F.3d 210, 222 (1st Cir. 1999)).

*(A) Agent Toro's Testimony*

*(i) "Overview" Testimony*

Feliciano claims that, as a result of improper "overview" testimony given by Agent Toro at the outset of the Government's case, "the jury heard that Appellant was not merely a part of the conspiracy but its leader" and "was invited to speculate about his role in the murder of the previous leader, and various shootings, including at Oscar Espada and Agent Toro." Because Feliciano

raised no objection to the testimony at trial, we review only for plain error.

This court on several occasions has strongly cautioned the Government against the practice of having a case agent make conclusory statements about a defendant's culpability at the beginning of the prosecution's case, before any supporting evidence has been offered. See, e.g., Garcia-Morales, 382 F.3d 12 (1st Cir. 2004); United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004); United States v. Mazza, 792 F.2d 1210 (1st Cir. 1986); see also 6 Weinstein's Federal Evidence § 1006.04[3] (observing that it is generally viewed as "improper . . . for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury"). In Casas, we explained that

> [the use of] overview testimony is inherently problematic: such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence. There is also the possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story. Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.

356 F.3d at 119-20.

The purported "overview" testimony that Appellant claims to be objectionable is contained largely in the following response of Agent Toro, on direct examination, to the question of why Espada stopped making recordings of narcotics activity at Covadonga:

Q. Why did those recordings stop in April 2003, sir?

A. Well, on April 5, 2003, one of the leaders of the drug point, whose name was Luis Osorio, also known as Trumpi, was murdered. Mr. Oscar Espada had developed a good friendship with Trumpi, with Luis Osorio, and when Mr. Alex Capo Trujillo and Wilfredo Feliciano Rodriguez took over the leadership of the drug point, they evicted or ran Mr. Espada out of the housing, public housing project, because Mr. Espada was perceived, was seen as being part of the organization, as part of the group, of Mr. Osorio's group.

Q. Sir, what happened to Mr. Espada after April '03?

A. Well, on a Sunday morning he was shot inside the housing project, the public housing project, and we decided to pull him out of the apartment.

As the Government concedes, Agent Toro's statement that Feliciano and Alex Trujillo assumed leadership of the Covadonga drug operation after the murder of "Trumpi" and "evicted or ran Mr. Espada out" of Covadonga, was precisely the sort of improper overview testimony from a case agent that we have condemned. Agent Toro's remarks were not based on his personal observations, and no evidence had been presented to support his conclusion that Appellant was in fact a leader of the drug point or that he participated in Espada's violent eviction from the housing project. See Garcia-Morales, 382 F.3d at 17 (finding that it was error to allow the case agent "to testify that [the defendant] was a member of the drug conspiracy, even though the prosecution had not yet introduced evidence supporting this conclusion"). In addition, Appellant argues that Agent Toro's statements were particularly harmful because they implicitly linked Feliciano to the attempted

-11-

shooting of Espada and to the murder of "Trumpi", thus inculpating Appellant in two highly prejudicial uncharged acts of violence, about which the Government presented no admissible evidence.

Although Agent Toro's statements constituted improper hearsay testimony, Appellant cannot surmount the high hurdle of plain error review and show that the improper remarks affected the outcome of the trial. The determination of whether Agent Toro's testimony was harmful "demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.'" Casas, 356 F.3d at 121 (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)).

Agent Toro's hearsay statement that Feliciano assumed leadership of the drug point was harmless in light of the ample evidence subsequently presented by the Government to prove that Feliciano did in fact act as a leader of the Covadonga drug point beginning in April 2003, following "Trumpi"'s murder. Omar Medina testified at length about Feliciano's leadership role at Covadonga. Medina's testimony established that Feliciano employed him, as well as at least five other sellers and runners, to sell heroin and cocaine on a daily basis. The evidence also showed that Feliciano

-12-

supplied his drug workers with firearms. In addition, the videotapes secretly made by Espada showed Feliciano carrying a weapon and engaging in drug transactions with individuals who Medina testified worked for Feliciano. Thus, because ample evidence was subsequently offered to show that Feliciano was, in fact, a leader of the drug conspiracy at Covadonga, Agent Toro's hearsay remarks had minimal impact and were harmless. See, e.g., United States v. Guadalupe, 407 F.3d 492, 500 (1st Cir. 2005) (finding no plain error in admission of purportedly improper overview testimony where government presented overwhelming evidence of defendant's guilt); Casas, 356 F.3d at 122 (finding that case agent's hearsay conclusion that defendant was leader of drug organization was harmless because such a conclusion "was the same determination that the jury would have drawn in the absence of the inadmissible testimony," in light of government's substantial evidence).

Similarly, although Agent Toro's conclusion that Feliciano and Trujillo ran Espada out of Covadonga remained unsubstantiated by subsequent evidence and possibly resulted in some small degree of prejudice against Feliciano, the error was ultimately harmless. Even if the jury accepted as true Agent Toro's conclusory remark about Appellant's involvement in Espada's violent ouster, the tainted material was hardly central to the Government's case.

To support a conviction for the charged narcotics conspiracy, the Government was not required to prove that Feliciano attempted to shoot Espada or otherwise participated in his eviction. See Garcia-Morales, 382 F.3d at 18 (finding improper testimony harmless in part because the evidence "was not essential to proving [Appellant's] involvement in the conspiracy"). Further, the Government did not make extensive use of Toro's suggestion that Feliciano ran Espada out of Covadonga. Apart from the above-quoted remark from Agent Toro's testimony, the Government did not link Feliciano to the attempted shooting of Espada and did not attempt in its opening or closing arguments to imply that Feliciano played a role in that incident. Finally, as discussed, the Government offered substantial evidence of Appellant's guilt. By contrast, the defense's case was relatively weak, largely limited to cross-examination of the prosecution's witnesses. In light of "the strength of the prosecution's case and the limited impact of the improperly admitted testimony, we are convinced that the jurors' judgment was not substantially swayed by the error." Id. (internal quotation marks and citation omitted).

To the extent that Appellant objects to Agent Toro's testimony on the ground that it permitted the jury to speculate about whether Appellant played a part in the murder of "Trumpi", the argument is without merit. Although Agent Toro stated that Feliciano became a leader of the drug point after "Trumpi" "was

-14-

murdered," Toro did not attribute the murder to Feliciano.  The mere possibility that the jury may have speculated that Feliciano played some role in the assassination of the individual whom he supplanted as an owner of the drug point does not rise to the level of plain error.

*(ii) Disclosure of Underlying Data*

Feliciano argues that Agent Toro, although qualified to give lay opinion testimony about the general operation of drug points under Rule 701 of the Federal Rules of Evidence, should not have been permitted to "reveal to the jury the underlying data on which he based his opinions, as is permitted, under certain conditions, for an expert testifying pursuant to Rule 702."  The only "underlying data" that Appellant identifies is "[h]earsay gleaned from police reports about [Appellant's] relation to Alex Trujillo's violent take over."

Rule 703 of the Federal Rules of Evidence provides, in pertinent part, that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.  Here, Appellant has failed to identify the underlying data that Agent Toro purportedly disclosed to the jury in discussing Alex Trujillo's role in the drug conspiracy at

Covadonga. There is no indication that Agent Toro quoted from, or cited to, police reports, the accounts of non-testifying informants, or other inadmissible material regarding Trujillo's relationship to Appellant or his "violent take-over" of the drug point at Covadonga. Although Agent Toro did briefly refer to an indictment filed against Trujillo by the "Mass Murder office," which charged Trujillo with drug activity in another housing project, that indictment had no connection to Trujillo's relationship with Appellant or with the drug conspiracy at Covadonga. Thus, Appellant's argument is without merit.

*(iii) Rule 403*

Feliciano claims that Agent Toro's comments regarding the murder of "Trumpi", the shooting of Espada in connection with the alleged takeover of Covadonga by Feliciano and Trujillo, and Trujillo's status as a fugitive wanted by Puerto Rico's "Mass Murder office" were unfairly prejudicial, in violation of Rule 403.

Under Rule 403 of the Federal Rules of Evidence even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial if it "invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (stating that a reviewing court should be "cautious when [evidence] is [] shocking or heinous [and, thus,] likely to inflame the jury"

-16-

(internal quotation marks omitted)); see also United States v. Currier, 836 F.2d 11, 18 (1st Cir. 1987) ("Unfairly prejudicial evidence . . . is evidence that triggers the mainsprings of human action in such a way as to cause a jury to base its decision on something other than the established proposition in the case." (internal quotation marks and brackets omitted)).  "[O]nly rarely -- and in extraordinarily compelling circumstances -- will [this court], from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Charles, 456 F.3d 249, 257 (1st Cir. 2006) (internal quotation marks omitted).

*Murder of "Trumpi" & Shooting of Espada*

Because Appellant did not object at trial to Agent Toro's statements about "Trumpi"'s murder, the subsequent attempted shooting of Espada, and Espada's flight from Covadonga, we review their admission only for plain error. The statements were not so unfairly prejudicial as to violate Rule 403.  The evidence had probative value because it helped to explain to the jury, first, why Espada stopped making videotapes and, second, the circumstances under which Feliciano assumed power at Covadonga, thus providing relevant contextual information.  By contrast the danger of unfair prejudice was slight, considering the brevity of the testimony and the fact that Agent Toro did not expressly implicate Appellant in

-17-

"Trumpi"'s murder or in the shooting of Espada.  Appellant has not shown that the potential for undue prejudice outweighed, let alone substantially outweighed, the probative value of Toro's statements. If there was any error, it was harmless, in light of ample evidence establishing Appellant's guilt of the charged crimes. See United States v. Taylor, 284 F.3d 95, 102 (1st Cir. 2002).

*Trujillo's Fugitive Status*

When asked the question, "who is Alex Trujillo," Agent Toro stated that Trujillo was a fugitive and that the "Mass Murder office" had filed an indictment against Trujillo, charging him with drug trafficking at a different public housing complex.  Because Appellant did not object to these statements or move to strike them, our review is for plain error.  The district court did not commit plain error in permitting Agent Toro to provide this brief testimony about Trujillo.  Although Trujillo's status as a fugitive was not highly probative of any element of the crimes with which Appellant was charged, the fact that Trujillo was wanted by Commonwealth and federal authorities for narcotics activity did provide the jury with helpful context.  See United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment."), quoted in Flemmi, 402 F.3d at 87.  Specifically, Toro's remarks clarified for the jury why Toro and other agents

-18-

searched Trujillo's apartment on July 1, 2003. The search, and its fruits, were important to the Government's case. The drugs seized from Trujillo's apartment were packaged and "branded" with several different markings, including markings that Medina testified were particular to the lines of cocaine and heroin that were sold by Appellant. That drugs belonging to different owners were found in a single apartment tended to show that the drug operation at Covadonga was a cooperative effort.

In addition, the district court restricted the scope of Toro's testimony about Trujillo's fugitive status by precluding the Government from offering into evidence a document, issued by the United States Marshals Service, indicating that Trujillo was a fugitive. Appellant has not shown how the district court plainly erred in balancing the probative value of Toro's testimony regarding Trujillo against its prejudicial impact. Moreover, as with Toro's statements regarding the murder of "Trumpi" and the attempted shooting of Espada, any error was harmless, in light of the Government's conclusive proof of Feliciano's guilt.

*(B) Medina's Testimony about the AR-15 Rifle*

While Medina was on the stand, the defense objected to the prosecution's attempt to elicit testimony about Medina's purchase of an AR-15 rifle for Alex Trujillo. At sidebar, the prosecution represented that Medina would testify that he subsequently saw Feliciano carrying the rifle that Medina

-19-

purchased. Medina was then permitted to testify about the purchase but never actually testified that he witnessed Feliciano carrying the AR-15 rifle that Medina had bought for Trujillo. Rather, Medina testified that he saw Feliciano carry a different AR-15 rifle and use the rifle to shoot at "shady"-looking cars that passed through Covadonga.

Feliciano claims that Medina's testimony regarding the rifle that Medina purchased on behalf of Trujillo was irrelevant and highly prejudicial. The Government concedes that Medina never testified that he saw Feliciano possess the identical rifle that Medina purchased for Trujillo. However, the Government contends that Medina's testimony regarding Feliciano's possession of another AR-15 rifle, and his firing of that rifle at passing cars, was highly relevant to the charges relating to Feliciano's use of guns in relation to drug trafficking.

The issue of the testimony's relevance is governed by Federal Rule of Evidence 401, which provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Generally, "all relevant evidence is admissible," while "evidence which is not relevant is not admissible." Fed. R. Evid. 402. Medina's testimony about Feliciano's use of the AR-15 rifle clearly was relevant. Medina's

testimony tended to establish that Feliciano used a rifle to protect Covadonga from interlopers. While Medina's testimony about his purchase of the AR-15 rifle on Trujillo's behalf may have been irrelevant to Feliciano's possession of a different AR-15 rifle, it was nevertheless relevant to show that Trujillo, as a co-owner of the drug point and a co-conspirator of Appellant's, conspired to possess weapons to protect the drug operation.

Further, Appellant has failed to show how testimony about Feliciano's possession of the rifle was unfairly prejudicial under Rule 403. Ample evidence was offered to establish that Feliciano carried guns on numerous occasions in order to protect his drug operation. Testimony about his possession and use of a rifle on the occasion described by Medina was not so inflammatory as to require exclusion. The district court did not abuse its discretion in allowing Medina to testify about Feliciano's possession of the rifle.

*(C) Espada's Testimony About Co-Conspirators' Statements*

Espada testified that he first learned about Feliciano's role as a drug dealer because "Saul" and "Miguelito", whom Feliciano employed as, respectively, a drug runner and seller, told Espada that Feliciano "was in charge of a drug point where he sold crack and cocaine . . . ." Espada further testified that "Saul" and "Miguelito" "talked to me about [Appellant], they pointed him out to me, and they indicated that he was like the big shot at the

drug point." (Id. at 211.)  Feliciano contends that these were highly prejudicial hearsay statements, with no basis in personal knowledge, and that the record is insufficient to permit a court to determine that the statements were properly admitted as co-conspirator statements, under Rule 801(d)(2)(E).

At the outset, we note that, although Appellant made a timely objection to Espada's testimony regarding the statements of "Saul" and "Miguelito", he "did not seek a ruling regarding co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E) and United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977)." United States v. Tom, 330 F.3d 83, 93 (1st Cir. 2003).  More importantly, Appellant did not seek a ruling, as required, "at the close of all evidence." United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980).  "For Petrozziello purposes, the critical juncture is the close of all the evidence." United States v. Candelaria-Silva, 162 F.3d 698, 706 (1st Cir. 1998).  Thus, our review of Appellant's claim regarding admission of the statements is for plain error. See Tom, 330 F.3d at 93; United States v. Woods, 210 F.3d 70, 78 (1st Cir. 2000).

A statement is not hearsay and is therefore admissible if it is offered against a party and is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). A statement is admissible under Rule 801(d)(2)(E) where the Government demonstrates "by a preponderance

-22-

of the evidence that a conspiracy existed, that the declarant and the defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy." Ciampaglia, 628 F.2d at 638. A statement is in furtherance of the conspiracy if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995) (quoting United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985)).

The statements made to Espada by "Saul" and "Miguelito" were admissible co-conspirator statements under Rule 801(d)(2)(E).

First, the evidence at trial was overwhelming that a drug conspiracy existed at the Covadonga housing complex.

Second, the Government's evidence firmly established that "Saul" and "Miguelito" were Appellant's co-conspirators in the distribution of drugs at Covadonga. Medina's testimony established that "Saul" was among the drug sellers who, in 2003, regularly sold $5 bags of heroin and cocaine for Appellant, that "Saul" was in fact one of Appellant's most successful sellers, and that he also acted as one of Appellant's runners. Officer Quintero, an undercover agent who posed as a drug buyer and regularly collected the videotapes made by Espada, testified that "Miguelito" owned a drug point at Covadonga and also acted as a drug seller. "Miguelito" was also identified, on one of the videotape recordings made by Espada, as a participant in a drug transaction.

Finally, it is also clear from the record that the statements made by "Saul" and "Miguelito" were in furtherance of the drug conspiracy.  By explaining Appellant's role in the Covadonga drug marketplace to Espada, "Saul" and "Miguelito" were in essence directing a potential customer to the source of narcotics, thus steering business toward Feliciano and advancing the objective of the drug ring.  The district court did not commit plain error in admitting the co-conspirator statements.

In sum, the evidentiary rulings identified by Appellant were either not errors or, if erroneous, were harmless in light of ample evidence of Appellant's guilt.  The claimed errors, considered either individually or cumulatively, do not warrant reversal of Feliciano's convictions.

*(II) Variance Between the Conspiracy Proven and the Conspiracy Charged*

Feliciano argues that he was prejudiced by a variance between the evidence presented at trial and the crimes charged in Counts One and Two of the Indictment.  Regarding Count One, Feliciano claims that the Government's proof showed that he participated only in one of many small, unrelated drug conspiracies operating within Covadonga, rather than the single, over-arching conspiracy charged in the Indictment.  Feliciano also contends that the proof impermissibly varied from the allegations set forth in Count One because the evidence showed that he acted as a co-leader with Alex Trujillo, rather than with Cristian Villegas, a/k/a

"Casi", as alleged in the Indictment. Regarding Count Two, Feliciano claims that the evidence failed to show that he conspired to possess guns in furtherance of the charged narcotics conspiracy with the specific individuals named in the Indictment. Further, Feliciano claims that the jury instructions on both Counts One and Two were erroneous and contributed to the prejudice that resulted from the variance on both counts.

A prejudicial variance occurs when: "(1) the facts proved at trial differ from those alleged in the indictment; and (2) the error affects the defendant's substantial rights (i.e., when the indictment fails to provide the defendant with sufficient detail to allow him to prepare a defense, avoid unfair surprise at trial, and plead double jeopardy when appropriate)." United States v. Pomales-Lebron, 513 F.3d 262, 269 (1st Cir. 2008) (internal quotation marks and citation omitted). A claim that the Government's proof varied impermissibly from the charges contained in the indictment is essentially a challenge to the sufficiency of the evidence. See United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). As with all such claims, "we 'canvass the evidence (direct and circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime.'" United States v. Perez-Ruiz, 353

-25-

F.3d 1, 5 (1st Cir. 2003) (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)).

Where, as here, an appellant claims that the evidence showed that he participated only in one of several, lesser uncharged conspiracies, rather than the single overarching conspiracy as charged in the indictment, we

> pay particular attention to factors such as whether the alleged conspirators shared a common purpose, whether their actions demonstrated interdependency, and the extent to which participants overlapped during the life of the alleged conspiracy. At the end of the day, a defendant cannot succeed with a sufficiency challenge as long as a plausible reading of the record supports the jury's implied finding that he knowingly participated in the charged conspiracy.

United States v. Balthazard, 360 F.3d 309, 314 (1st Cir. 2004) (internal quotation marks and citations omitted).

Here, the Government presented sufficient proof that Feliciano participated as a drug owner in the charged conspiracy. The Indictment charged that the object of the conspiracy was to possess with intent to distribute and to distribute "cocaine, cocaine base ('crack'), heroin, and marihuana, at different drug distribution locations ('drug points') in the Nuestra Senora de Covadonga Public Housing Project . . . for significant financial gain or profit." The Indictment further charged that Appellant acted as one of the "Leaders and Owners" of the charged conspiracy. As discussed above, the testimonies of Medina and Espada, as well as the videotapes made by Espada, established that Feliciano acted

as an owner of a heroin and cocaine drug point within Covadonga from April 2003 until his arrest on June 1, 2004.

There was little variance (and no material variance) between the Indictment and the proof presented at trial of Appellant's drug trafficking at Covadonga. The Indictment did not, as Appellant implies, define the drug conspiracy at Covadonga as a "single," "master," or "overarching" conspiracy. Further, as the Government correctly notes, even if the Indictment could be construed as charging Feliciano with being a leader of an overarching drug conspiracy at Covadonga, "the evidence established that the sub-conspiracies indeed functioned as a part of the grander drug scheme at Covadonga." Ample evidence established that the Covadonga housing project functioned as a busy narcotics bazaar in which the owners of different "brands" of cocaine, crack, heroin, and marijuana cooperated to sell their distinctly labeled products. The success of each owner's drug operation depended on the overall security of Covadonga, and look-outs employed by different drug owners acted for the Covadonga marketplace's benefit as a whole. Appellant's own act of firing a rifle at cars being driven through Covadonga by perceived outsiders suggests that the different drug owners at Covadonga maintained a common interest in securing the housing project against outsiders. There was also substantial evidence presented of overlap among the different drug operations, consisting not only of the common use of look-outs, but

of different owners' use of the same sellers and runners. For example, Medina's testimony established that he sold heroin for two different owners and marijuana for a third owner. In addition, cohesion among the different "sub-conspiracies" is also implied by the fact that drugs "branded" with the marks of different owners were recovered from Trujillo's apartment; the jury reasonably could have inferred that the owners of different drug points used a common space to store their respective drugs and drug paraphernalia. In sum, there was sufficient evidence for the jury reasonably to have concluded that, although many drug owners operated within Covadonga, the Covadonga drug marketplace itself functioned as a single drug conspiracy.

Even if some variance existed between the Government's evidence and the allegations contained in the Indictment, Feliciano was not unfairly prejudiced. See United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995) ("[S]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged -- so long as the difference does not cause unfair prejudice."). Specifically, no prejudice resulted from the fact that the evidence showed that Appellant was allied with Alex Trujillo, rather than Cristian Villegas, or that Appellant ran one of several drug points at Covadonga, rather than the entire drug organization. Regardless of the identity of Feliciano's alleged co-leader or the exact scope of Appellant's

control of the drug activity at Covadonga, the Government was required to prove, and succeeded in proving, that Feliciano acted as a leader of a Covadonga drug point, as alleged in the Indictment, by employing different sellers and runners to sell drugs, and by carrying guns and supplying his underlings with guns. Thus, Feliciano's "central defense needed to be that he was not part of [the Covadonga] organization -- as [an owner of drugs], or in any other capacity." United States v. Alicea-Cardoza, 132 F.3d 1, 6 (1st Cir. 1997) (finding no impermissible variance where defendant was indicted "for being a conspirator/triggerman but the evidence proved him a conspirator/runner"). The defense mounted by Feliciano did not center on responding to the particular charge that Appellant was allied with "Casi". Nor did Appellant prepare a defense under the mistaken belief that he could concede his involvement in a smaller conspiracy and was required to contend only with the Government's effort to prove that he oversaw all of the drug points operating within Covadonga. In sum, Feliciano was not "misled by the government's evidence at trial to defend himself on the wrong grounds" and thus was able to "prepare an effective defense and avoid surprise at trial." United States v. Fornia-Castillo, 408 F.3d 52, 68 (1st Cir. 2005) (internal quotations and citations omitted).

Similarly, no prejudice resulted to Appellant from the purported variance between the weapons conspiracy charged in Count

Two of the Indictment and the Government's proof. Count Two of the Indictment alleged that Feliciano conspired to use guns in furtherance of the drug conspiracy charged in Count One with three co-defendants named in the Indictment (Jose Claudio Ortiz, Jorge Rodriguez Rosa, and Alfred Rodriguez Rosa) and one co-conspirator not named in the Indictment (Juan Carlos Rojas Rodriguez, a/k/a "Carli"). Feliciano argues that the evidence simply did not show that he conspired with any of the four named men to possess or use firearms in furtherance of the charged drug conspiracy.

The Government presented sufficient proof that Feliciano conspired with others to posses firearms in furtherance of the drug conspiracy. The "essence" of conspiracy is an agreement to commit a crime. Iannelli v. United States, 420 U.S. 770, 777 (1975). Here, the Government proved that an agreement existed between Feliciano and fellow members of the Covadonga drug market to possess guns in order to provide protection and enforcement for their drug trade. For example, Medina testified that in 2003, when he was working at the Covadonga drug point for Feliciano, Feliciano, Medina, and other sellers carried weapons. In addition, Medina testified that the use of weapons by drug point workers had to be authorized by Feliciano and his co-leader, Trujillo. The Government also proved the existence of the unlawful agreement by showing conduct, namely the fact that drug owners and sellers regularly carried guns at Covadonga while dealing in drugs, from

which the agreement to possess guns in furtherance of the drug conspiracy could be inferred. See United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) (stating that an agreement may be inferred from other evidence including a course of conduct).

The Government offered no evidence, however, to show that any of the four individuals named in Count Two of the Indictment directly conspired with Feliciano to possess firearms. In addition, there appears to have been no evidence to show that Ortiz, Jorge Rosa, or Alfred Rosa actually possessed firearms.[1] Nevertheless, despite the lack of any evidence showing an agreement to possess weapons between Feliciano and the four named individuals, it is undisputed that the four individuals named in the Indictment were members of the drug conspiracy. It is also undisputed that Appellant, as well as other drug owners and sellers at Covadonga, regularly carried guns to protect themselves and their drug business. "Taking this evidence in the light most favorable to the government, the jury was entitled to conclude that the possession of firearms, given the dangerous nature of the conspiracy, was a part of that conspiracy's common course of action." United States v. Sullivan, 455 F.3d 248, 261 (4th Cir. 2006). In other words, the jury reasonably could have inferred an agreement to possess guns between Feliciano and the four named

---

[1] There was evidence, however, to show that "Carli" possessed a gun. Specifically, Medina identified "Carli" as carrying a firearm on one of the videotapes made by Espada.

individuals because they were all members of the Covadonga drug conspiracy, and members of the drug conspiracy habitually carried weapons in furtherance of the drug activity.

In any event, the variance between the allegations in Count Two of the Indictment and the proof adduced at trial was slight and did not operate to mislead Appellant. Even if the jury convicted Feliciano on the basis of his conspiracy to possess firearms with another co-defendant rather than the four named individuals, this variance was permissible. See Alicea-Cardoza, 132 F.3d at 6 (finding no prejudice in variance because "error in the indictment was not so grave as to cause [appellant] to defend himself on the wrong grounds, especially when the evidence adduced at trial showed [appellant] to be deeply involved in" the charged conspiracy). Here, the Indictment charged, and thus Feliciano was on notice, that he conspired to possess guns in furtherance of the Covadonga drug conspiracy not only with the four named individuals, but also "with others, known and unknown." (Indictment at 10.) As with Count One, Appellant cannot plausibly claim that he was misled into mounting a defense against Count Two on the wrong grounds. Appellant's defense against the charges in Count Two required that he contend with the Government's efforts to prove that he agreed to possess guns with other drug workers at Covadonga. No unfair surprise or other prejudice resulted from the Government's presentation of evidence that established Appellant's participation

in the conspiracy to possess weapons with individuals other than the four specific persons named in the Indictment. Thus, to the extent a variance existed, it was permissible.

Feliciano also argues that the district court erroneously instructed the jury regarding the conspiracies charged in both Counts One and Two. We first note that Appellant failed to propose alternate jury instructions or to object in a timely manner to the district court's jury instructions. "When a defendant neglects to interpose a contemporaneous objection to the trial court's jury instructions in conformity with Federal Rule of Criminal Procedure 30, subsequent claims of instructional error are, for the most part, forfeit."[2] United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001). A narrow exception exists, however, for plain error. See United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001). "[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001); see also United States v. Weston, 960 F.2d 212, 216 (1st Cir. 1992) ("While reversal of a conviction predicated on unpreserved instructional error is

---

[2] The rule provides in pertinent part:
> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the ground of the objection.

Fed. R. Crim. P. 30.

theoretically possible, [it is] the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.").

Regarding Count One, Appellant protests that the district court's instructions erroneously authorized a conviction upon proof of a conspiracy other than that charged in the Indictment. The record indicates, however, that the district court correctly explained the elements of conspiracy and referred expressly to the conspiracy charged in the Indictment. Specifically, the court instructed that the Government must prove beyond a reasonable doubt the existence of a conspiracy to distribute the charged quantities of drugs "inside the public housing facility known as Covadonga." The court referred to the specific charged conspiracy, namely the conspiracy to distribute narcotics at Covadonga, several times during its instruction on Count One. Appellant has not shown how these instructions were erroneous, let alone how the instructions were so deficient as to constitute plain error. Compare Paniagua-Ramos, 251 F.3d at 246 (noting that plain error might theoretically be found in cases of "glaring omission," where, for example, "a trial court fails to instruct a criminal jury on a basic point like the government's burden of proof or the presumption of the defendant's innocence").

Similarly, the district court's instructions on Count Two did not constitute plain error. The court's initial instruction

regarding Count Two instructed that it was a crime "to conspire during and in relation to a drug trafficking crime, as charged in count I, to use or carry a firearm or to conspire to possess a firearm in furtherance of such drug trafficking crime." As the Government concedes, this instruction erroneously permitted the jury to convict Appellant "for a conspiracy to 'use or carry a firearm,' so long as the conspiracy, rather than the use, took place during and in relation to some drug trafficking crime." In other words, the initial instruction wrongfully authorized the jury to convict by finding that Feliciano agreed with others, at some point during the drug conspiracy, to possess firearms, without also finding that the possession was intended to be in relation to the drug conspiracy.

Almost immediately afterward, however, the district court repaired its error and issued a correct instruction by stating that the Government was required to prove that Feliciano "willfully and intentionally conspir[ed] to commit the offense of using or carrying a firearm during and in relation to a drug trafficking crime, or of conspiring to possess a firearm in furtherance of such drug trafficking crime . . . ." Shortly afterward, in limning the element of specific intent for Count Two, the court repeated the correct instruction.

We do not propose that the court's instruction, including as it did an initial misstatement of the applicable law, "is either

-35-

letter perfect or insusceptible to any improvement." <u>Paniaqua-Ramos</u>, 251 F.3d at 246. However, in light of the district court's immediate correction and Appellant's failure to suggest an alternate instruction or interpose a contemporaneous objection to the initial, flawed instruction, we find that the instruction as to Count Two did not rise to the level of plain error.

In sum, we conclude that there was no prejudicial variance between the crimes charged in Counts One and Two of the Indictment and the proof of those crimes presented by the Government at trial. We also find that the jury instructions relating to Counts One and Two were not plainly erroneous.

*(III) Sentencing Errors*

Feliciano claims that (a) his sentence was based on an unreliable calculation of drug quantity; (b) the sentence was unreasonable because the court failed properly to consider the relevant statutory factors; (c) his life sentence on Count Two unlawfully exceeded the statutory maximum of twenty years; (d) the trial court improperly found that he brandished a firearm in imposing a seven-year sentence on Count Four; and (e) the conviction and 25-year sentence on Count Six must be vacated because it was a second section 924(c) conviction for a single predicate act and thus violated double jeopardy.

*(A) Drug Quantity*

Feliciano argues that the district court erred in finding that at least 150 kilograms of cocaine were attributable to him. Although the district court made a clearly erroneous finding as to drug quantity, the error was harmless in light of substantial additional evidence in the record that supports the court's ultimate finding that Appellant was accountable for more than 150 kilograms of cocaine during the charged conspiracy.

A district court's factual finding regarding the amount of drugs attributable to a member of a drug conspiracy will be disturbed only if it is clearly erroneous. United States v. May, 343 F.3d 1, 6 (1st Cir. 2003). To determine drug quantity, a court looks to all acts "'that were part of the same course of conduct or common scheme or plan as the offense of conviction,' and takes into account not only what the defendant knew, but what conduct he reasonably foresaw." United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004) (quoting U.S.S.G. § 1B1.3(a)(2)). "Thus, each co-conspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." Id. The trial court's determination of drug quantity need only be by a preponderance of the evidence and is not required to be an exact determination but rather only a reasoned estimate. See id. at 141. Further, if the trial court bases its estimate on

one of two plausible views, the determination is not clearly erroneous. Id.

In determining that Feliciano was responsible for at least 150 kilograms of cocaine, the district court found that, during Appellant's 397-day tenure as a leader of the Covadonga drug point, the drug point operated for twenty-four hours each day, and that each day six different sellers, who worked for Appellant, sold approximately 125 bags of cocaine. Based on these assumptions, the court calculated that 297,750 bags of cocaine were attributable to Feliciano. The court further assumed that, based on the testimony of the Government's forensic chemist, who weighed the contents of the fifty bags that Espada purchased from Appellant's drug point in a pre-arranged, undercover buy on April 4, 2003, each bag contained approximately 0.5685 grams of cocaine powder. Thus, the court calculated, it would take approximately 1,759 bags to constitute one kilogram of cocaine. Based on these estimates, the court found that approximately 169 kilograms of cocaine were attributable to Feliciano. The quantity of 150 kilograms or more yielded a base offense level of 38. The court imposed a four-level enhancement for Feliciano's leadership role and a two-level enhancement for a protected location,[3] for an adjusted offense level of 44, which in turn yielded a recommendation under the guidelines of life imprisonment.

---

[3] Feliciano does not challenge the enhancements.

Feliciano argues, first, that the weight attributed to each bag of cocaine was improperly based on a minute sampling of only 50 of the nearly 300,000 bags for which he was held accountable. Next, Feliciano protests that the court's assumption that six sellers were selling 125 bags each, every day for 397 consecutive days exaggerated "the number of bags per day, the number of sellers, and the number of days." Feliciano notes that the 78 videotapes made by Espada tended to show a less vigorous level of narcotics activity at the drug point than that testified to by Medina. Feliciano also argues that Medina's testimony regarding the number of shifts and number of sellers at most indicated that each of the six sellers was working every other day, rather than every day. Finally, Feliciano attacks the reliability of Medina's estimates, characterizing Medina as "an interested, illiterate witness addicted to cocaine and marijuana whose inability to manage measures of virtually anything was marginal." (Id. at 52.)

The district court did not clearly err in determining drug quantity on the basis of the relatively small sampling of bags of cocaine that were weighed by the Government's chemist. The court's finding was supported by evidence offered at trial. Specifically, Medina testified that cocaine was routinely sorted into quantities of 100 bags, or "decks," each of which constituted an "eighth." From this testimony, the court reasonably could have

inferred that 100 bags equaled one eighth of a kilogram of cocaine, which in turn would result in the determination that each of the 297,750 attributed to Appellant contained approximately 1.25 grams of cocaine. The district court properly relied on the more conservative estimate of .5685 grams per bag, thereby "'chos[ing] between plausible estimates of drug quantity but [] err[ing] on the side of caution.'" United States v. Hall, 434 F.3d 42, 61 (1st Cir. 2006) (quoting United States v. Marks, 365 F.3d 101, 105 (1st Cir. 2004)).

The district court also did not clearly err in determining, from Medina's testimony, the number of days during which Appellant acted as the owner of the drug point, the fact that the drug point operated 24 hours each day, or the fact that sellers worked in three daily shifts and each seller sold an average of 125 bags of cocaine per day. While it is true that Medina was not especially exact in his description of dates, times, weights, and numbers, he nevertheless was intimately involved, as both a runner and seller, in the operation of Appellant's drug point. Within wide limits, not exceeded here, it was the exclusive role of the trial court to decide the weight to give to Medina's testimony and whether to use it as the basis of its drug quantity determination. See United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999) ("Notwithstanding some minor discrepancies in [the cooperating witness's] testimony, we do not think it unreasonable . . . to

believe that the testimony of a man experienced in drug deals was sufficient to establish an appropriate drug quantity.") (internal quotation marks and citation omitted); see also United States v. Webster, 54 F.3d 1, 5 (1st Cir. 1995) (upholding district court's decision to credit testimony at sentencing from "an admitted perjurer, a drug user, and a turncoat, who received a substantially reduced sentence for implicating others"); United States v. Indelicato, 97 F.3d 627, 632 (1st Cir. 1996) ("Credibility judgments at sentencing are the trial judge's province. . . .") (citation omitted).  Given Medina's extensive involvement with Feliciano in the drug activity at issue, it was not clear error for the trial court to credit Medina's estimations and use them as the basis of its calculation of the overall quantity of cocaine that was attributable to Feliciano.  Nor did the court clearly err in opting to credit Medina's testimony rather than infer, from the content of Espada's videotapes, that the drug trade was less brisk than Medina described.

The district court committed clear error, however, in finding that six sellers worked "every day," selling cocaine, during the period of Appellant's leadership. As Medina's testimony established, and as the Government concedes, each seller worked only every other day.  Thus, based on Medina's testimony, the court reasonably could conclude only that the equivalent of three, rather than six, sellers worked each day.  The district court therefore

erroneously doubled the quantity of cocaine attributable to Feliciano during his 397 days of leadership, and on its reasoning should have found that Appellant was responsible for 84.5 kilograms of cocaine, rather than 169 kilograms.

If a district court makes an erroneous factual finding under the sentencing guidelines, yet "there is enough evidence to support the alternative explanation for the court's finding, the error would be harmless and there would be no reason to remand to the district court when the result will be the same." United States v. Pizarro-Berrios, 448 F.3d 1, 8 (1st Cir. 2006); see also United States v. Brown, 450 F.3d 76, 80 (1st Cir. 2006). We therefore must decide whether the record supports the finding that Appellant was responsible for more than 150 kilograms of cocaine.

There was ample additional evidence in the record to establish that an additional quantity of cocaine, sufficient to make up for the "lost" 84.5 kilograms, was attributable to Feliciano by virtue of his activity as a drug runner and packager for Bebe, from 1998 to 2002. Medina's testimony (which the court credited) established that both he and Feliciano acted as runners for Bebe from 1998 to 2002, and that Feliciano delivered between 50 and 100 bags of cocaine, two or three times per day. As the Government correctly notes, using the most conservative estimates of 50 bags of cocaine, twice per day, over a period of four (rather than five) years, a total of 146,000 additional bags, or

approximately 84.6 kilograms, of cocaine are properly attributable to Feliciano. These estimates are especially cautious because they account only for the cocaine that Appellant personally handled, as a runner or packager, and not for additional amounts handled by other runners or sellers who worked for Bebe, such as Medina, and whose drug activity was reasonably foreseeable by Feliciano. Although the district court did not make specific drug quantity calculations relating to Appellant's conduct as a drug runner and packager, the court noted in its sentencing memorandum that, in addition to the drugs attributable to Appellant as a result of his activity as a leader of the drug point in 2003 and 2004, "defendant served as a 'runner' or decked cocaine at that same [drug] 'point' beginning in 1998 and throughout the years 1999, 2000, 2001, and 2002." Thus, the district court expressly considered Feliciano's role as a runner, from 1998 through 2002, as an alternative explanation for the finding that he was responsible for more than 150 kilograms of cocaine.

In sum, because there is clear record support for the district court's finding that Appellant was accountable for more than 150 kilograms of cocaine during the charged conspiracy, we need not remand for re-sentencing on this issue.

*(B) Reasonableness*

Appellant claims that his sentence of life plus 32 years is unreasonable because the district court failed to pay proper

consideration to several of the relevant factors set forth in 18 U.S.C. § 3553(a).

Following the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738 (2005), we review challenges to sentences for reasonableness, regardless of whether the sentence falls within the range recommended under the United States Sentencing Guidelines. See United States v. Deppe, 509 F.3d 54, 62 (1st Cir. 2007). "Even though Booker decreed the sentencing guidelines to be only advisory, the guidelines still play an important role in the sentencing procedure, so that (as was done here) a court should ordinarily begin by calculating the applicable guideline range." United States v. Gilman, 478 F.3d 440, 445 (1st Cir. 2007). After calculating the advisory Guidelines range, the court "must evaluate the factors set out in Section 3553(a) to consider whether to exercise its discretion to impose a non-guideline sentence . . . and no less important, the court must provide a detailed, case-specific explanation for imposing the chosen sentence." Id. (internal citations omitted). "The sentencing court may not mechanically assume that the [Guidelines] frame[] the boundaries of a reasonable sentence in every case." United States v. Martin, No. 06-1983, 2008 U.S. App. LEXIS 5906 (1st Cir. Mar. 21, 2008) (citing Gall v. United States, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007)). Ultimately, we review a trial court's sentence with substantial deference, and as long "as we

-44-

discern 'a plausible explanation' for the sentence and a 'defensible overall result,' we will not second-guess the district court's informed judgment." Id. (quoting United States v. Jimenez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc)).

Feliciano contends that the district court, in imposing a life sentence, did not sufficiently account for several of the factors set forth in Section 3553(a). Appellant claims that aspects of his history should have militated in favor of a more lenient sentence, including his lack of a criminal record; the suicide of his father when Feliciano was only eleven years old; and Feliciano's upbringing in the housing project amidst poverty, violence, and drug trafficking. Feliciano also argues that the need for just punishment is not served because "the sentence imposed, while it certainly fulfills the need for punishment, responds to a conception of justice close to revenge." In addition, Feliciano asserts that the goal of rehabilitation is overwhelmed by the accomplishment of specific deterrence, namely "incapacitation."

Feliciano's within-guidelines sentence was not unreasonable. The district court expressly stated at sentencing that it had considered the factors set forth in Section 3553(a), recited the factors, and then gave a specific explanation for the sentence. The court noted the protracted life span of the drug conspiracy and Appellant's long-term participation in the criminal

enterprise; Appellant's role as a leader for more than one year; and Appellant's use of weapons. The court concluded that, "[a]ll factors considered, [Feliciano's] role as a leader of this very dangerous criminal venture requires that Defendant be sentenced as recommended by the advisory guideline range, a sentence that is sufficient but not greater than necessary to meet sentencing objectives of criminal punishment and deterrence." That the court chose to allocate greater weight to the aggravating factors of Appellant's crimes, and less to potentially mitigating factors such as the unfortunate circumstances of Appellant's upbringing, "entailed a choice of emphasis, not a sin of omission" and "is not a basis for a founded claim of sentencing error." Deppe, 509 F.3d at 62; see also United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) ("While a sentencing court must consider all of the applicable section 3553(a) factors, it is not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision.").

Because the district court considered the relevant statutory factors and provided a plausible explanation for the within-guidelines range sentence it imposed, Appellant's challenge to the reasonableness of his sentence fails.

*(C) Life Sentence on Count Two Exceeded Statutory Maximum*

Appellant contends, and the Government concedes, that the life sentence imposed on Count Two exceeded the twenty year

statutory maximum sentence on Count Two. <u>See</u> 18 U.S.C. § 924(c) and (o). We therefore vacate the sentence on Count Two and remand for the imposition of a sentence of no more than twenty years. <u>See</u> <u>United States</u> v. <u>Ziskind</u>, 491 F.3d 10, 18 (1st Cir. 2007).

*(D) Finding of Brandishing*

The district court imposed the statutory mandatory minimum sentence of seven years on Count Four on finding that Appellant brandished a firearm in connection with his possession of a weapon on April 10, 2003, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Under the statute, a defendant is deemed to have brandished a firearm when he "display[s] all or part of the firearm, or otherwise make[s] the presence of the firearm known to another person, in order to intimidate that person." 18 U.S.C. § 924(c)(4). Appellant argues that there is no basis in the record for the court's finding of brandishing and thus the sentence must be vacated. Although Appellant did not object below to the court's finding of brandishing, and we thus review the claim only for plain error, the Government conceded at oral argument that there was no record support for the court's determination that Appellant brandished a firearm.

Review of the record confirms what the Government now concedes: there is no evidence that Appellant or his co-conspirators made the presence of a firearm known to anyone else in order to intimidate that other person. The Government's evidence

relating to Count Four appears to have consisted of portions of the videotape recorded by Espada on April 10, 2003 as well as Medina's commentary about those recordings. The relevant portions of the videotape simply showed Appellant handing a firearm to a drug dealer who operated out of another housing complex and showed "Carli" Rojas, a seller who worked for Feliciano, in possession of a firearm. The record is devoid of any indication that either Appellant or his co-conspirator displayed firearms with the purpose of intimidating other persons. Accordingly, we vacate Appellant's brandishing conviction on Count Four.

*(E) Consecutive Sentences on Section 924(c) Counts*

Feliciano points out that his convictions for Count Four and Count Six arise from the same predicate offense, namely, possession or use of a firearm in relation to the same drug conspiracy, in violation of section 924(c). The only difference between the two counts is that one incident of gun possession occurred on April 10, 2003 and the second incident occurred on April 19, 2003. Feliciano argues that the dual section 924(c) convictions, arising as they do from the same underlying drug conspiracy, violated the prohibition against double jeopardy, and that this was plain error. Thus, Feliciano claims, his sentence on Count Six should be vacated and he should be sentenced only for his conviction on Count Four. The Government agrees that Counts Four and Six are based on a single predicate drug offense and concedes

that it was improper for the trial court to impose two consecutive sentences for section 924(c) violations arising from the same drug conspiracy.

In United States v. Pena-Lora, we adopted the position taken by the majority of our sister circuits and held that the imposition of multiple consecutive sentences under subsection 924(c) for using multiple weapons during a single predicate crime "would impinge upon fundamental 'double jeopardy' principles." 225 F.3d 17, 32 (1st Cir. 2000); see also United States v. Anderson, 59 F.3d 1323, 1334 (D.C. Cir. 1995); United States v. Lindsay, 985 F.2d 666, 674 (2d Cir. 1993); United States v. Privette, 947 F.2d 1259, 1262-63 (5th Cir. 1991); United States v. Taylor, 13 F.3d 986, 994 (6th Cir. 1994); United States v. Cappas, 29 F.3d 1187, 1191 (7th Cir. 1994); United States v. Fontanilla, 849 F.2d 1257, 1258-59 (9th Cir. 1988); United States v. Moore, 958 F.2d 310, 312 (10th Cir. 1992); United States v. Hamilton, 953 F.2d 1344, 1346 (11th Cir. 1992). Accordingly, in Pena-Lora, we found that the district court had committed plain error in imposing consecutive sentences for the appellant's two acts of firearm possession that had taken place during a single underlying act of hostage-taking.

Here, too, the district court plainly erred in imposing multiple consecutive sentences for two acts of firearm possession arising from the same predicate drug conspiracy. Thus, we must vacate one of the two section 924(c) convictions and remand for re-

sentencing on the remaining count. Having determined that the district court erred in finding that Appellant brandished a firearm in imposing sentence on Count Four, it now "makes no difference under § 924(c) whether [Feliciano] is convicted and sentenced for Count [4] or Count [6], since both carry five-year mandatory minimum penalties and both are supported by sufficient evidence." Taylor, 13 F.3d at 994. Thus, we vacate Appellant's conviction and sentence on Count Four, affirm Appellant's conviction on Count Six, and remand to the district court for re-sentencing on Count Six to the statutory minimum term of five years, to run consecutively to the sentences imposed on Counts One and Two.

## CONCLUSION

For the foregoing reasons, we AFFIRM Feliciano's conviction and sentence on Count One. We AFFIRM Feliciano's conviction on Count Two but VACATE the sentence previously imposed on that count and REMAND for re-sentencing with an order to the district court to re-sentence Appellant on that count to term of no more than twenty years. Feliciano's conviction on Count Four is VACATED and the special assessment on that count is to be removed. Feliciano's conviction on Count Six is AFFIRMED, but we vacate the sentence previously imposed on that count and REMAND for re-sentencing with an order to the district court to sentence Appellant on that count to the statutory mandatory minimum term of

-50-

five years, to run consecutively to the sentences imposed on Counts One and Two.