# United States Court of Appeals
## For the First Circuit

No. 06-1376

UNITED STATES OF AMERICA,

Appellee,

v.

THURSTON GENE GILMAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Howard, Circuit Judge,
Selya, Senior Circuit Judge,
and Shadur,* Senior District Judge.

John J. Commisso, with whom Thomas M. Hoopes and Kelly, Libby
& Hopes, P.C. were on brief, for appellant.
    Victor A. Wild, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Cynthia A. Young,
Assistant United States Attorney, were on brief, for the United
States.

March 8, 2007

_____
* Of the Northern District of Illinois, sitting by designation.

**SHADUR, <u>Senior District Judge</u>**. Thurston Gene Gilman ("Gilman") challenges his criminal sentence, urging that the district court below committed multiple procedural errors by (1) placing too much weight on the advisory sentencing guidelines, (2) failing to explain adequately the reasons for the sentence imposed and (3) taking into account impermissible considerations as part of his sentencing decision. Gilman also argues that his sentence is unreasonably high in light of various mitigating circumstances.

We find all of Gilman's arguments unpersuasive save one two-part contention: that the district court (1) failed to provide an adequate explanation of its sentencing decision "in open court," as required by 18 U.S.C. §3553(c), and (2) failed to particularize his reason for the specific sentence imposed, as required by 18 U.S.C. §3553(c)(1).[1] Nonetheless, because Gilman forfeited those arguments in the court below, we are limited to plain-error review. And because Gilman cannot show that the error affected his substantial rights, we affirm the sentence imposed by the district court.

<u>Background</u>

On July 18, 2005 Gilman pleaded guilty to one count of willful violation of the Investment Advisers Act of 1940 in

---

[1] For convenience, further citation to that section will take the form "Section 3553--," omitting the prefatory reference to Title 18 U.S.C.

-2-

contravention of 15 U.S.C. §§80b-6 and 80b-17 and to 18 counts each of mail fraud and wire fraud in violation of 18 U.S.C. §§1341 and 1343 respectively.  As recounted in the Presentence Investigation Report ("PSI") prepared by the Probation Office, the tale leading up to that guilty plea is a disheartening story of betrayal of personal relationships and trust that came to an end only after Gilman saw his house of cards collapsing beneath him and came clean via his plea.

Before he embarked on his criminal activities, Gilman had been an independent securities broker and investment advisor for more than 20 years, serving long-term clients with whom he developed close personal as well as professional relationships. Beginning in November 1998 and continuing until November 2003, Gilman abused his position and the trust that his clients placed in him by illegally and fraudulently diverting investors' funds from the domestic securities accounts that they believed they owned into two start-up ventures operated by Gilman.  Gilman hid those actions from his clients by periodically issuing false account statements assuring them that their money was invested and appreciating as promised.

While it is unnecessary to detail the ins and outs of Gilman's scheme, it does bear mention that he went so far as to dragoon one of his sons into the plot, apparently contributing to that son's nervous breakdown and hospitalization in the summer of

2003.  Gilman's start-ups--a software outfit and an Italian sunglasses distributor--did not work out as he had planned, and his unwitting investors' money was lost.  Those losses, totaling more than $11 million, impacted retirement funds, college savings and estate plan assets of some 55 victims.

In November 2003, with the Securities and Exchange Commission ("SEC") investigating an unrelated but too-close-to-home issue with one of his other dealings, Gilman decided that the jig was up.  Though it was still possible that the SEC would not discover his fraud, Gilman had his lawyer communicate with the United States Attorney's Office in Boston to self-report the crime and cooperate with the government in uncovering the extent of his misdealing.  Hoping that the government would spare any prosecution of his son (which it did), Gilman cooperated with the investigation and provided extensive information that assisted the government in fully exposing his complex scheme and identifying all of the deceived victims.  Without the benefit of a plea bargain, Gilman then entered a straight plea of guilty to all of his crimes.

We arrive now at the critical scene for this appeal: Gilman's sentencing hearing in January 2006.  Using the 2005 Sentencing Guidelines Manual ("Manual") and information reported in the PSI, the district court calculated Gilman's base offense level as 7 (Guideline §2B1.1(a)(1)) and added 20 levels for the over $11 million in resulting losses (Guideline §2B1.1(b)(1)(K)), 4 levels

for the 55 victims involved (Guideline §2B1.1(b)(2)(B)), 2 levels for the sophisticated means used in the offense (Guideline §2B1.1(b)(9)(C)), 4 levels for the violation of securities law by a registered investment advisor (Guideline §2B1.1(b)(15)(A)(iii)) and 2 levels for being an organizer, leader, manager or supervisor of criminal activity with fewer than five culpable participants (Guideline §3B1.1(c)).  After a 3-level reduction for Gilman's acceptance of responsibility and his early guilty plea (Guideline §3E1.1(a)-(b)), the district court reached a net offense level of 36.  That, together with Gilman's criminal history category I, produced a guideline range of 188 to 235 months.  Gilman did not object to any of those calculations.[2]

After hearing from several victims of Gilman's scheme and listening to Gilman's arguments for departure and mitigation, the district court pronounced sentence.  Addressing Gilman, the court said that after hearing the victims' statements it was moved to think about the harm caused by Gilman's fraud--the loss of planned retirements, college savings and savings for health needs as well as the frustration of inheritance plans--as compared to the harm caused by some of the drug crimes, committed by individuals from difficult backgrounds, for which it regularly handed down long prison sentences.  Next the court addressed Congress' growing

---

[2]  Gilman did object to the use of the 2005 Manual rather than the 2002 Manual, but he has not advanced that objection here on appeal.

concern with economic crimes since 2000 and spoke of the abuse of personal and professional trust at the root of Gilman's deceit.

At that point the court likened Gilman's requested sentence to the "worst day" that the court had ever had on the bench, a case in which the court had felt compelled by the then-mandatory sentencing guidelines to hand down a harsh 204 month sentence for a man convicted of burning down his own convenience store to collect the insurance money. In closing, the district court said that it was primarily moved by the stories of lives "shattered" by Gilman's crime, and it imposed the selfsame 204 month sentence--one that was in the middle of the established guideline range.

### Challenges to the Sentencing Procedure

Gilman first brings a multifaceted challenge to the sentencing procedure followed by the district court. We review de novo such legal challenges to sentencing procedure (United States v. Rivera, 448 F.3d 82, 84 (1st Cir. 2006)). But when a defendant has failed to raise such an objection below, we treat the issue as forfeited and hence as reviewable only for plain error (United States v. Turbides-Leonardo, 468 F.3d 34, 38 (1st Cir. 2006)). To establish plain error an appellant bears the burden of showing (United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)):

> (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or

-6-

or public reputation of judicial proceedings.

Since the Supreme Court decided <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005), we have had several occasions to set forth a proper sentencing procedure to be followed by district courts--most definitively in our en banc decision in <u>United States</u> v. <u>Jiménez-Beltre</u>, 440 F.3d 514, 518-19 (1ˢᵗ Cir. 2006).  Even though <u>Booker</u> decreed the sentencing guidelines to be only advisory, the guidelines still play an important role in the sentencing procedure, so that (as was done here) a court should ordinarily begin by calculating the applicable guideline range (<u>id</u>. at 518).  Once that now-advisory range is established, the court must evaluate the factors set out in Section 3553(a) to consider whether to exercise its discretion to impose a non-guideline sentence (<u>United States</u> v. <u>Thurston</u>, 456 F.3d 211, 215 (1ˢᵗ Cir. 2006)).  Finally, and no less important, the court must provide a detailed, case-specific explanation for imposing the chosen sentence (<u>id</u>.).

Gilman's first challenge to the procedure followed in this case--his argument that the district court placed too much weight on the guidelines, effectively treating them as mandatory--may be set aside quickly.  On that score Gilman seeks support in such indicia as (1) the court's use of the word "departure" and not "mitigation," (2) the court's emphasis on the policies it saw behind the stiffer guideline ranges for economic crimes that took effect in November 2003 and (3) the court's failure to state in so

-7-

many words that it was treating the guidelines as advisory under Booker.

That compound contention does not hold water in any respect. While the district court did not state for the record that it was treating the guidelines as advisory, it is clear from the sentencing transcript that everyone recognized that to be true. Thus Gilman's attorney expressly asked for departure or for Section 3553(a) mitigation, and the court itself just as specifically asked the government to respond to the question whether it should not impose a guideline sentence at all. Moreover, given the continuing importance of the guidelines as a means for bringing the policy decisions of the Sentencing Commission into the sentencing process, the court's measured deference to the policies behind the guideline recommendations for Gilman's economic crimes was entirely appropriate (see United States v. Pho, 433 F.3d 53, 62 (1st Cir. 2006)).

In short, although the guidelines had a significant influence on the district court's sentencing decision, it plainly treated them as advisory while considering Gilman's arguments-- though it did not find them ultimately persuasive--for applying a non-guideline sentence. There is surely no error in that.

Gilman's second front in his procedural challenge to the sentencing gives us more pause. There he contends that the district court failed to provide an adequate explanation for the

sentence imposed by not speaking to the Section 3553(a) factors that should have been addressed, instead taking into account other factors that should not have been considered, and in the end by leaving a record too limited for effective appellate review.

There is no question that a district court is required to provide a reasoned and case-specific explanation for the sentence it imposes.  Whether a sentence is within or outside the guideline range, we require such an explanation to enable us to review the reasonableness of the sentence (Jiménez-Beltre, 440 F.3d at 519). And beyond that, Section 3553(c) requires a sentencing judge to "state in open court the reasons for its imposition of the particular sentence"--and most particularly, where (as here) the applicable guideline range exceeds 24 months the court must articulate "the reason for imposing a sentence at a particular point within the range."

Turbides-Leonardo, 468 F.3d at 40-41 (citations and internal quotation marks omitted) recently summarized the principles we have applied in reviewing district courts' sentencing explanations.  We allow a good deal of leeway:

> This [Section 3553(c)] directive does not mean that the sentencing court's explanation need be precise to the point of pedantry.  While the court ordinarily should identify the main factors upon which it relies, its statement need not be either lengthy or detailed.  By the same token, a sentencing court is not required to address frontally every argument advanced by the parties, nor need it dissect every factor made relevant by 18 U.S.C. §3553

-9-

one by one, in some sort of rote incantation, when explicating its sentencing decision. Even silence is not necessarily fatal; a court's reasoning can often be inferred by comparing what was argued by the parties or contained in the presentence report with what the judge did.

While we have on occasion gone to significant lengths in inferring the reasoning behind, and thus in affirming, some less-than-explicit explanations by district courts (see, e.g., United States v. Scherrer, 444 F.3d 91, 94-95 (1st Cir. 2006)(en banc); United States v. Navedo-Concepción, 450 F.3d 54, 57-58 (1st Cir. 2006); United States v. Feliz, 453 F.3d 33, 36 (1st Cir. 2006)), there are limits. First, if we are in fact unable to discern from the record the reasoning behind the district court's sentence, appellate review is frustrated and "it is incumbent upon us to vacate, though not necessarily to reverse" (Feliz, 453 F.3d at 36) the decision below to provide the district court an opportunity to explain its reasoning at resentencing (see also United States v. McDowell, 918 F.2d 1004, 1012 (1st Cir. 1990)). Second, because Section 3553(c) calls for an explanation "in open court" at the time of sentencing, we may remand for resentencing when a court has provided no explanation at the sentencing hearing (see, e.g., Navedo-Concepción, 450 F.3d at 56 & 56 n.1).

Here the district court weighed the perceived relative harms caused by the economic crimes committed by Gilman and by the drug crimes for which the court routinely handed down lengthy

prison terms, then considered the policy behind the increased guideline sentences for economic crimes beginning in November 2003. Next the court rather obliquely discussed the 204 month sentence it had reluctantly handed down in the earlier arson case under what were, at that pre-Booker time, considered mandatory sentencing guidelines. Finally, the court explained that it was primarily influenced by the victims' statements about how Gilman's conduct "shattered" their lives, and then announced the 204 month guideline sentence for Gilman.

Those in-court statements, which the court itself referred to as a "sort of soliloquy," suggest a consideration of the harm caused to society by Gilman's conduct, and we can infer from them that the court considered and found unpersuasive Gilman's arguments for a below-guideline sentence (see Scherrer, 444 F.3d at 94-95). Here, however, that is not enough. While Turbides-Leonardo, 468 F.3d at 41 allows "a lesser degree of explanation" when a within-guideline-range sentence is imposed, the statement here does not identify the reason that the district court imposed a sentence in the middle of the guideline range rather than elsewhere within that range (which spans more than 24 months), in direct violation of Section 3553(c)(1). We find the district court's explanation insufficient as a matter of law under that section.

But we see no suggestion in the record that Gilman

-11-

objected to that deficiency in the court below.  Having failed to do so, he has forfeited his Section 3553(c)(1) argument, and he must thus make a showing of plain error to win a remand on that score (Duarte, 246 F.3d at 60).  Even if the shortfall of the court's explanation in that respect is viewed as an obvious error, that would leave Gilman standing only at second base.  To make it to home plate by establishing plain error, Gilman must round each of the bases as to which he carries the burden of persuasion (Turbides-Leonardo, 468 F.3d at 39).

To reach third base in those terms, Gilman must show that the inadequate explanation affected his "substantial rights" (id.), a term that has generally been taken to mean that he must show that the error was prejudicial in the sense that "[i]t must have affected the outcome of the district court proceedings" (United States v. Olano, 507 U.S. 725, 734 (1993)).  In the sentencing context that translates to a requirement that a defendant must paint a picture that illuminates "a reasonable probability that, but for the error, the district court would have imposed a different, more favorable sentence" (Turbides-Leonardo, 468 F.3d at 39).

To look for a moment outside our circuit, United States v. Molina, 356 F.3d 269, 277-78 (2d Cir. 2004) also proves helpful in our review of Gilman's chances in that regard.  Molina concluded that even though the sentencing court had committed error

-12-

under Section 3553(c)(1) by not sufficiently stating in open court the grounds for its decision, the court nonetheless facilitated appellate review by providing a sufficient reasonable explanation in a written statement of reasons, and for that reason the defendant could not show that he was prejudiced under plain error review.

While in this instance the district court's statement at the sentencing hearing itself was inadequate as a matter of law, the record provides no reason to believe that remanding this case to the district court for resentencing would in any way alter Gilman's sentence (see Navedo-Concepción, 450 F.3d at 57). To that end we have looked to the later written statement of reasons accompanying the judgment and commitment order, a statement in which the district court itemized multiple case-specific reasons for the length of the sentence: (1) the substantial length of the fraud that came to an end only after discovery by the SEC became likely, (2) Gilman's facilitation of his crime through the betrayal of trust placed in him by friends, (3) his callousness to the degree of harm involved in the destruction of retirement, health and education savings and (4) his willingness to lure his own unwilling son into the terrible mess that he had created. In conclusion the district court "concede[d]" that the sentence he imposed was driven by the "nature and circumstances of these particular offenses and the need to provide just punishment in

light of the nature and circumstances involved."

Even though that explanation was statutorily called for at the time of sentencing, its belated pronouncement shows the district court's reasoning that ties the defendant's specific conduct to Section 3553(a) considerations and to specific relevant goals of sentencing. In affirming another district court's sentencing decision, Scherrer, 444 F.3d at 93-94 found very similar factors, such as the harm caused by a fraudulent betrayal of trust leading to the loss of retirement funds, to be entirely appropriate considerations of the "nature and characteristics of the offense and the history and characteristics of the defendant" per Section 3553(a)(1). With the district court in this case thus having made its explanation clear--albeit belatedly--for appellate review, we cannot believe that the court would be persuaded to alter its course on a resentencing. Under that analysis Gilman cannot show that he has been prejudiced by the district court's Section 3553(c)(1) violation, so as to make a case for plain error.

Gilman also takes a slightly different tack to challenge the adequacy of the district court's explanation, asserting that it suggests reliance on three impermissible factors: (1) congressional intent, (2) a comparison of drug crime with economic crime and (3) the sentence imposed by the court in the earlier arson case. We find those arguments unpersuasive as well.

Two of those contentions merit short shrift indeed. As

for the first, it was entirely appropriate for the court to consider what it viewed as the congressional intent behind the sentencing guidelines in evaluating the individual characteristics of this case (see Pho, 453 F.3d at 62). Second, Gilman's argument that the comparison of drug crimes and economic crimes was error under Section 3553(a)(6) because they do not equate to "similar conduct" is likewise without merit. Plainly the district court was not suggesting that a drug peddler and Gilman were "defendants with similar records who have been found guilty of similar conduct" under Section 3553(a)(6). Instead it was permissibly weighing the comparative harms caused by those crimes in an effort to impose a "just punishment for the offense" under Section 3553(a)(2)(A).

Gilman's argument as to the earlier arson case is similarly unavailing. Although the district court ultimately imposed identical terms of imprisonment in the two cases, it is again clear that was not for Section 3553(a)(6) purposes. Instead the length of the earlier sentence obviously factored into the court's consideration of the harm caused by Gilman and the sentence accordingly required to impose just punishment on him. We cannot reasonably expect a district court to approach each sentence as a tabula rasa, divorced from its experience and decisions as to other criminal defendants whom it has had the trying duty to sentence.

### Challenge to the Length of Sentence

In Gilman's final salvo of challenges he asserts that his

sentence is unreasonably high due to a failure of the district court to weigh the Section 3553(a) factors and various mitigating circumstances properly. In the absence of any error in the calculation of the guideline range, and in the presence of a discernable explanation for the sentencing decision, we review a sentencing court's considered judgment solely for reasonableness (Jiménez-Beltre, 440 F.3d at 519). We approach that review with measured deference, respecting the district court's primary responsibility for sentencing and recognizing that "there can be more than one reasonable way of assessing a factor and more than one reasonable result" (id.). Because Gilman seeks here to attack an in-guideline-range sentence as excessive, he must "adduce fairly powerful mitigating reasons and persuade us that the district judge was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be 'reasonable'" (Navedo-Concepción, 450 F.3d at 59).

Perhaps Gilman's most significant contention is that because his entire crime save for one wire transfer was executed before the effective date of the 2003 Manual,[3] that one transaction dramatically increased his sentence due to the higher guideline range for his collective crimes that took effect at that time. In that regard, the guideline rule that mandates the use of the

---

[3] That Manual substantially upped the ante for significant financial crimes, a treatment carried forward into the 2005 Manual that the district court employed pursuant to Guideline §1B1.11(a).

Manual in effect as of the date of sentencing, irrespective of the date of the offense of conviction (see n. 5) does not apply if such use would violate the Ex Post Facto Clause (Guideline §1B1.11(b)(1)). Although we note that the Court of Appeals for the Seventh Circuit has concluded that <u>Booker</u>'s ruling that the guidelines are advisory rather than mandatory carries with it the elimination of ex post facto concerns (<u>United States</u> v. <u>Demaree</u>, 459 F.3d 791, 795 (7th Cir. 2006)), the issue is doubtful in this circuit: see the references to the Ex Post Facto Clause in <u>United States</u> v. <u>Cruzado-Laureano</u>, 404 F.3d 470, 488 & n.10 (1st Cir. 2005), a post-<u>Booker</u> decision (by three months) relying on a pre-<u>Booker</u> case.

But even if ex post facto considerations are thus in play, Gilman does not prevail in any event. To be sure, the sentencing hearing transcript reflects the district court's acknowledgment that the single wire transfer was "wagging this very, very big dog." But the court applied the later Manual in conjunction with its view that the important policy that underlay the increased guideline sentences as to economic crimes that took effect in November 2003 should also be taken into account. More significantly, Gilman's November 2003 wire transfer marked the completion of his last offense of conviction under his straight guilty plea. And that being so, the startlingly parallel situation in <u>Cruzado-Laureano</u> calls for application of the 2003 Manual here.

-17-

Here is what we said in that case (404 F.3d at 488 (emphasis in original)):

> Even in a complex case like this one, involving conduct that occurred on dates implicating different versions of the manual, it will not be necessary to compare more than two manuals to determine the applicable guideline range--the manual in effect <u>at the time the last offense of conviction was completed</u> and the manual in effect at the time of sentencing.

And in that light we there concluded that it was a mistake of law for a district court to use an earlier Manual when defendant's last unlawful act charged in one count had been committed just a month after the new Manual took effect, even though all of the other 11 counts of conviction plus two of the three acts that made up the twelfth count involved conduct that antedated the new Manual's effective date. That decision might well have been written for this case, and it controls here.

Gilman also seeks special sentencing consideration for what he considers an extraordinary acceptance of responsibility, evidenced by the self-reporting of his illegal scheme to the government plus his cooperation that may have helped identify victims who might otherwise have been left ignorant of his deceit. Again it is clear that the district court considered that argument and found it overbalanced by the fact that Gilman came clean only after the SEC was investigating his other dealings, creating a likelihood that the victims would come out of the woodwork

-18-

inquiring about their money.

Finally, Gilman's brief focuses on the disparity between the 204 month sentence imposed on him and the sentences in two other cases involving, in Gilman's view, similarly situated defendants. As <u>Scherrer</u>, 444 F.3d at 95 has explained, however, "[t]rying to compare an individual sentence with a few counsel-selected cases involving other defendants sentenced by other judges is almost always useless." Gilman has not sufficiently demonstrated that those cases are somehow representative or are sufficiently comparable to his case to make a compelling argument that any disparity is unjustified.

<u>Conclusion</u>

In sum, we have considered all of Gilman's arguments as to mitigation and as to the reasonableness of his sentence and find them insufficient to meet his burden on appeal. We therefore affirm the sentence imposed by the district court.

AFFIRMED.