# United States Court of Appeals
## For the First Circuit

No. 22-1883

UNITED STATES,

Appellee,

v.

NATHAN REARDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Kayatta, Thompson, and Rikelman,
Circuit Judges.

Hunter J. Tzovarras for appellant.

Benjamin M. Block, Assistant United States Attorney, with
whom Darcie N. McElwee, United States Attorney, was on brief, for
appellee.

May 23, 2024

**RIKELMAN, <u>Circuit Judge</u>**. After pleading guilty to bank fraud, Nathan Reardon was sentenced to twenty months of imprisonment followed by three years of supervised release. As part of its sentence, the district court imposed a special condition that prohibits Reardon from all forms of self-employment during his supervised release term. Reardon -- concerned about how he would support his family given that he was self-employed for the twenty-four years prior to sentencing -- challenges this special condition on appeal. Because the district court imposed this ban without an explanation for why it was the minimum restriction necessary to protect the public, as required by the U.S. Sentencing Guidelines, and we cannot infer from the record that the court engaged in this analysis, we vacate the ban and remand for reconsideration of the scope of that restriction.

## I.    BACKGROUND

### A.    The Paycheck Protection Program

We begin with the critical facts that led to Reardon's guilty plea. In March 2020, Congress enacted emergency financial assistance programs to ameliorate the economic fallout of the COVID-19 pandemic. <u>See</u> Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified as amended at 15 U.S.C. § 636(a)(36)). One such program, the Paycheck Protection Program (the "PPP"), facilitated loans to small businesses so that the businesses could continue to operate

and pay their workers during the economic downturn.  See 15 U.S.C. § 636(a)(36)(F)(i).  PPP loans could be used only for certain expenses, such as payroll costs, mortgage or rent payments, and utility payments.  See id.  The maximum permitted loan amount could not exceed 2.5 times a business's average monthly payroll costs.  See id. § 636(a)(36)(E).  Although the loans were issued by private lenders, they were guaranteed by the federal government and could be forgiven if a business used the funds to cover its payroll costs and other specified expenses.  See id. §§ 636(a)(36)(B), 636m(b).

To obtain a PPP loan, a business was required to make several good-faith certifications, including that: it "ha[d] employees for whom [it] paid salaries and payroll taxes"; it would use the funds "to retain workers and maintain payroll or other covered expenses," including rent, utility, and mortgage interest payments; and the information provided in the loan application and supporting documents was "true and accurate."

### B.    Reardon's Fraudulent PPP Loan Applications[1]

Between April and May of 2020, Reardon submitted to TD Bank four fraudulent PPP loan applications, each seeking $59,145, on behalf of several of his businesses.  Two of the applications sought loans for Global Disruptive Technologies, Inc. ("GDT"), and

---

[1] Because Reardon pleaded guilty, we draw these facts from the transcript of the sentencing hearing and undisputed portions of the revised presentence investigation report.  See United States v. Benoit, 975 F.3d 20, 21 (1st Cir. 2020).

the other two concerned Choice Auto Sales Group, LLC and Membership Holdings, Inc. In each company's application, Reardon reported inflated payroll amounts,[2] submitted documentation that misrepresented the true amounts, and certified that any PPP funds would be used to retain workers, maintain payroll costs, or cover other eligible expenses. TD Bank approved the first of the two GDT applications and denied the remaining applications.

Reardon then spent the GDT loan funds on expenses that were not permissible under the PPP. In March 2021, he applied for forgiveness of the GDT loan, falsely certifying that he had used the funds for permissible purposes and that his initial loan application was true and accurate. TD Bank denied Reardon's request for forgiveness of the GDT loan.

## C. Procedural History

In May 2021, Reardon was indicted on five counts of bank fraud, three counts of attempted wire fraud, two counts of making false statements to a bank, and one count of perjury. He was released pending trial on certain conditions, one of which prohibited him from "apply[ing] for any pandemic-related financial

---

[2] Reardon certified $23,658 as each company's average monthly payroll costs during the first quarter of 2020. (The total he sought in each loan application, $59,145, is 2.5 times that amount.) However, GDT employees were actually paid only $1,353.18 over the first three months of 2020, and Choice Auto Sales Group and Membership Holdings had no payroll costs at all, as they had no employees at the time.

assistance without prior approval of the supervising [probation] officer."  In April 2022, the district court revoked Reardon's pretrial release after it learned that he submitted eleven unauthorized applications for pandemic-related financial assistance on behalf of one of his companies.  The probation officer noted that the company in question, Ultimate Property Holdings, had no authority to do business in Maine at the time but did not suggest that any other aspect of these applications was misleading.[3]  In July 2022, pursuant to a plea agreement, Reardon pleaded guilty to the five counts of bank fraud.[4]

Before sentencing, the probation officer prepared a revised presentence investigation report ("PSR") in which she detailed Reardon's employment history.  The probation officer noted that Reardon had "been self-employed for 24 years"; had owned and operated various businesses; and, in 2020, "entered lease-to-own agreements for three apartment buildings" in Maine (which, according to Reardon, were his only business ventures operating at the time).

---

[3] The probation officer did state, however, that Reardon had used $125 of the fraudulently acquired PPP funds to create Ultimate Property Holdings in April 2020.

[4] At the sentencing hearing and consistent with the plea agreement, the government dismissed the remaining charges for attempted wire fraud, making false statements, and perjury.

As part of Reardon's term of supervised release, the probation officer recommended that the district court impose several special conditions, including the following (special condition six):

> Defendant shall not be self-employed and shall be continuously employed for compensation by a disinterested third party. Defendant shall not open any businesses, sole proprietorships, partnerships, limited partnerships, or corporations. Defendant shall dissolve any corporations and businesses that exist on the date of sentencing.[5]

The probation officer offered the following rationale for the self-employment ban: "[It] is based on the defendant's reported 21-years of self-employment, during which he accrued extreme debt, resulting in three separate applications for bankruptcy with a combined debt of over $1,500,000, and likely led to his committing the instant offense. Indeed, he used his businesses to commit the instant offenses."

Reardon filed a written objection to the self-employment ban, arguing that it was "overly restrictive and unnecessary for the purposes of sentencing and supervised release." In response, the probation officer explained that the self-employment ban was appropriate because:

> [Reardon] reported only ever being self-employed which has resulted in three applications for bankruptcy associated with

---

[5] Following the parties' lead, we refer to special condition six as the "self-employment ban."

businesses established by [him] as detailed in paragraph 65 [of the PSR] [and] the business involvement in the instant offense . . . . [Reardon] owes a significant amount in restitution. Prohibiting self-employment reduces the risk of [Reardon] engaging [in] criminal business practices and increases the likelihood of the restitution being paid in a timely fashion.

In November 2022, Reardon appeared before the district court for sentencing and explained his objection to the proposed self-employment ban. His counsel argued that it was "overly restrictive," as "other conditions . . . could be imposed . . . [to] assure that he is not committing crimes and that he receives any services or supervision for rehabilitation appropriately." Defense counsel also noted:

Mr. Reardon's been self-employed almost his entire career, 24 years . . . . He has a minor conviction, a misdemeanor . . . back in 2011 for unpaid taxes and other than that and this current offense that we're here for in court, that occurred over approximately one month, Mr. Reardon has no criminal history related to his self-employment. He has gone years and years without incurring criminal conduct because of his self-employment, that's how he supported himself, that's how he supported his family[6] really since he started working.

And . . . over the last few months, Mr. Reardon has attempted to run his businesses, particularly the apartments that he rents in Dexter and Howland the best he can from jail

---

[6] Reardon has a wife (a homemaker) and five children (four of which -- according to his counsel at sentencing -- have special needs).

- 7 -

and he's done that and [been] able to make and generate enough income to pay $9,000 towards restitution . . . .

The fact that Mr. Reardon's been able to use his business, the apartments, that he's rented over the last several months to start making the victim whole in this case, I think is significant and shows that he should be able to continue to run these apartments and be self-employed so he can continue to pay back the restitution that he's already started to pay. So for those reasons, Your Honor, we don't think you should restrict him from being self-employed during the course of supervised release.

The government, for its part, acknowledged that there could be a "middle ground," explaining that "the self-employment condition at least could be caveated appropriately to make sure that it's not a writ large prohibition against self-employment, but that there would be mandatory consultation with the supervising probation officer." The government also noted that, although the self-employment restriction was "a very well-founded proposed condition," it recognized that "an individual should be within certain . . . boundaries [] entitled to try to make a living." Finally, the government added that it was in its "best interest and restitution payee's best interest for Mr. Reardon to make a living after he serves the term of his sentence so he can pay restitution."

The district court overruled Reardon's objection to the self-employment ban, providing the following reasoning:

> I take [the government]'s point [about a middle ground] . . . but under the circumstances, both in terms of the underlying conduct that brings us here today and in terms of the travel of this case, particularly as it related to Mr. Reardon's bail being revoked, I think the more cautious approach would simply be for me to adopt the proposed condition as it relates to self-employment and leave it at that. And to the extent that Mr. Reardon wishes to present to the Court, at a later date, a modification of his conditions of supervised release, whether it relates to the condition that he not be self-employed or any other conditions based on his success while on supervised release, . . . he can bring that to the Court in a more ordinar[y] fashion.

Before imposing Reardon's sentence, the court stated that it was "adopt[ing] the revised presentence investigation report in its entirety as constituting [the court's] findings." The court then sentenced Reardon to twenty months of imprisonment and three years of supervised release and ordered him to pay $60,316.39 in restitution.

For the supervised release term, the court imposed each of the special conditions recommended by the probation officer and explained that such conditions were "based on [its] findings, which [were] co-extensive with the four corners of the revised . . . PSR." The seven special conditions included, along with the self-employment ban, requirements that Reardon "provide the supervising [probation] officer any requested financial information" and "participate and comply with the requirements of

- 9 -

the Computer and Internet Monitoring Program (which may include partial or full restriction of computer(s), internet/intranet, and/or internet-capable devices), and . . . submit to periodic or random announced searches of his . . . computer(s) . . . and/or other electronic or internet-capable devices(s)."

Reardon timely appealed.

## II.  DISCUSSION

Reardon challenges the self-employment ban as an unnecessary and overbroad special condition of supervised release. Because Reardon preserved his challenge below, we review the district court's imposition of the ban for abuse of discretion. See United States v. Windle, 35 F.4th 62, 67 (1st Cir. 2022). Under this flexible standard, we evaluate "fact findings for clear error, legal issues de novo . . ., and judgment calls with some deference."  United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021).

### A.    Special Conditions of Supervised Release

We have not previously analyzed when a court can restrict self-employment during supervised release.  Because there are specific statutory requirements for imposing occupational restrictions, we begin with a review of those requirements.

All special conditions of supervised release must meet a threshold standard.  They must be "based on the circumstances of the offense and the defendant's history" and "'involve[] no greater

deprivation of liberty than is reasonably necessary' to achieve the goals of sentencing, such as" protection of the public, deterrence, and rehabilitation. United States v. Benoit, 975 F.3d 20, 26 (1st Cir. 2020) (quoting 18 U.S.C. § 3583(d)); see U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 5D1.3(b) (providing that district court may impose discretionary conditions of supervised release); 18 U.S.C. § 3553(a)(2) (listing the goals of sentencing).

Occupational restrictions, however, require even more. In recognition of the impact such restrictions can have on individuals' ability to re-enter society after imprisonment, occupational restrictions are subject to a heightened standard. See United States v. Vélez-Luciano, 814 F.3d 553, 562 (1st Cir. 2016) (noting that courts must apply "the more-stringent U.S.S.G. § 5F1.5 standard" when imposing occupational restrictions); United States v. Prochner, 417 F.3d 54, 65 (1st Cir. 2005) ("[A]n occupational restriction [is] subject to the specific limitations of 18 U.S.C. § 3563(b)(5) and U.S.S.G. § 5F1.5."). Thus, a court may impose such a restriction "only if" it determines that: "(1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction"; and "(2) . . . such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will

continue to engage in" similar unlawful conduct. U.S.S.G. § 5F1.5(a); see also 18 U.S.C. § 3563(b)(5) (permitting occupational restrictions to the extent they are reasonably related to the § 3553(a)(1) and (a)(2) factors and "involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)").

Further, if all the requirements for an occupational restriction are met and the district court decides to impose such a restriction, the Sentencing Guidelines limit its scope: the court "shall impose the [restriction] for the minimum time and to the minimum extent necessary to protect the public." U.S.S.G. § 5F1.5(b) (emphases added); see, e.g., United States v. Mills, 959 F.2d 516, 519-20 (5th Cir. 1992) (upholding portion of condition that prohibited defendant, who was convicted of manipulating odometers, from participating in sale of cars but rejecting other portion that required him to sell car dealership as "not the minimum condition reasonably necessary to protect the public"). This standard aims to "preclude the [defendant's] continuation or repetition of illegal activities while avoiding a bar from employment that exceeds [the scope] needed to achieve that result." U.S.S.G. § 5F1.5 cmt. background (quoting S. Rep. No. 225, at 96-97 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3279-80).

As with any special condition of supervised release, a sentencing court should provide a "reasoned and case-specific explanation" for an occupational restriction and its scope. United States v. Pabon, 819 F.3d 26, 30 (1st Cir. 2016) (citation omitted); see 18 U.S.C. § 3553(c) ("The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence . . . ."). When a court does not provide such an explanation, we may infer its reasoning "by comparing what was argued . . . [or what was] in the pre-sentence report with what the judge did." United States v. Colón-Cordero, 91 F.4th 41, 53 (1st Cir. 2024) (quoting United States v. Carrasquillo-Sánchez, 9 F.4th 56, 62 (1st Cir. 2021)). Still, "'there are limits' to our willingness to supply our own justification for a particular [condition]." United States v. Perazza-Mercado, 553 F.3d 65, 75 (1st Cir. 2009) (quoting United States v. Gilman, 478 F.3d 440, 446 (1st Cir. 2007)); cf. Colón-Cordero, 91 F.4th at 54 (acknowledging "different ways a ghost gun being in the factual mix . . . could affect" sentencing court's decision to impose a variance but declining to speculate "which reasons -- if any -- were actually what the sentencing court had in mind when pronouncing sentence" because "the court didn't say").

When we cannot readily discern from the record the district court's reasoning, "'it is incumbent upon us to vacate,

though not necessarily to reverse' the decision below to provide the district court an opportunity to explain its reasoning at resentencing." Gilman, 478 F.3d at 446-47 (citation omitted) (quoting United States v. Feliz, 453 F.3d 33, 36 (1st Cir. 2006)); see, e.g., Perazza-Mercado, 553 F.3d at 76, 79 (vacating special condition and remanding where district court did not adequately explain, and record did not support, the condition). We are especially inclined to vacate and remand when a district court does not engage with one of the defendant's primary, nonfrivolous arguments at sentencing. See Colón-Cordero, 91 F.4th at 55-56; cf. Rita v. United States, 551 U.S. 338, 357 (2007) ("Where the defendant or prosecutor presents nonfrivolous reasons for imposing a . . . sentence [that departs from the Sentencing Guidelines], . . . the judge will normally go further and explain why he has rejected those arguments.").

And, depending on the sentencing decision, a court may need to provide a more robust explanation. See Rita, 551 U.S. at 356 ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances."). For example, a sentence that falls outside the range recommended by the Sentencing Guidelines requires more explanation than a sentence within the range, and the greater the deviation from that range, the greater the justification required. See Colón-Cordero, 91 F.4th at 51. Similarly, the more restrictive a special

condition of supervised release, the greater the justification required.  See, e.g., <u>United States</u> v. <u>Del Valle-Cruz</u>, 785 F.3d 48, 62 (1st Cir. 2015) (explaining that condition impairing defendant's relationship with his child "require[d] a greater justification" because it "involve[d] a very significant deprivation of liberty"); <u>see also</u> <u>United States</u> v. <u>Boyd</u>, 5 F.4th 550, 557 (4th Cir. 2021) ("[A]s a general matter, the more onerous the term of supervised release -- whether due to its duration or to the rigor of its conditions -- 'the greater the justification required.'" (citation omitted)).  Given the heightened standard for occupational restrictions, it is especially important for district courts to provide sufficient explanation for the scope of such restrictions.

With this framework in mind, we turn to Reardon's challenge to the self-employment ban.  We address the validity of such a ban only in the narrow set of circumstances before us.

**B. The District Court's Imposition of a Self-Employment Ban**

Reardon contends that the self-employment ban is not reasonably related to his offense conduct because it broadly prohibits any type of self-employment rather than targeting a particular occupation, is more restrictive than necessary to achieve the purposes of supervised release, and is unnecessary to

protect the public.[7]  He also argues that the district court "offered no explanation" suggesting otherwise.  The government disagrees and emphasizes that, even if "the district court's commentary was deficient," the court's reasoning for the self-employment ban is evident from the record.  Additionally, the government highlights the possibility that the self-employment ban could be modified at some point during Reardon's supervised release, as the district court alluded to at sentencing.

As we noted above, we have not previously considered when a district court may impose a self-employment ban during supervised release.  And there are few published decisions on point from our sister circuits.  See, e.g., United States v. Ferguson, 537 F. App'x 713, 716 (9th Cir. 2013) (unpublished) (finding no abuse of discretion where sentencing court imposed self-employment ban based on "concern that defendant is an economic danger to the community" and could repeat his fraud scheme if his business conduct was not supervised); United States v. Heaser, 298 F. App'x

---

[7] Reardon argues in his opening brief that the self-employment ban is "unnecessary for the purposes of sentencing" but presents a narrower argument in his reply brief that the ban is "unnecessary to protect the public."  Because he has not developed his argument as to how the self-employment ban is unnecessary to achieve the goals of sentencing other than protection of the public, such as deterrence and rehabilitation, we do not consider here whether the ban "involves [a] greater deprivation of liberty than is reasonably necessary" to achieve those other goals.  18 U.S.C. § 3583(d)(2).  Our inquiry instead focuses on whether the imposition of the self-employment ban satisfies the heightened requirements of U.S.S.G. § 5F1.5.

502, 504-05 (7th Cir. 2008) (unpublished) (upholding on plain error review "conditions prohibiting [the defendant] from working for himself or an immediate relative" because he "used his 'self employment' to conceal from the probation officer purchases with funds that should have gone to [the] victims [of his mail fraud] and could easily use a business under the name of his wife or a close family member to do the same"). Thus, we focus on the plain text of section 5F1.5 in evaluating the ban.

To review, to impose a restriction on self-employment, the district court was required to find that: (1) "a reasonably direct relationship existed between" Reardon's self-employment and his offense conduct (i.e., his bank fraud); (2) "there [was] reason to believe that, absent such restriction, [Reardon would] continue to engage in" similar unlawful conduct, and, therefore, the "restriction [was] reasonably necessary to protect the public"; and (3) the scope of the restriction was "the minimum extent necessary to protect the public." U.S.S.G. § 5F1.5(a)-(b). We consider whether the record allows us to evaluate the district court's analysis for all three requirements, and, if so, whether the total ban satisfies all three requirements.

As we explain in greater detail below, the district court did not discuss section 5F1.5(b) or the "minimum extent necessary" standard, and there is no mention of section 5F1.5(b) or its substantive requirements in the PSR. Thus, although we can well

understand why the district court exercised its discretion to impose an occupational restriction here, we cannot be sure on this record that an analysis of whether a complete self-employment ban was the minimum restriction necessary was ever undertaken. Instead, the record suggests that the focus below was on crafting a broad restriction as a precautionary measure. We therefore vacate and remand for resentencing on this special condition.

### 1. Whether a "Reasonably Direct Relationship" Existed Between Reardon's Self-Employment and Offense Conduct and a Self-Employment Ban Would Be Reasonably Necessary to Protect the Public

Before imposing the self-employment ban, the district court was required to evaluate if there was "a reasonably direct relationship" between Reardon's self-employment and his offense conduct and, if so, whether the ban was necessary to protect the public against future unlawful conduct. See id. § 5F1.5(a)(1)-(2). We do not dwell on these requirements because we remand for re-evaluation of the scope of the restriction here. But we observe that the record certainly would support a finding that an occupational restriction was warranted. The PSR detailed how Reardon leveraged three of his businesses to submit four fraudulent PPP loan applications and, after one application was approved, misused the loan funds and fraudulently sought forgiveness on the loan. These facts demonstrate, as the probation officer concluded in the PSR, that Reardon "used his businesses to

commit the instant offenses." Because Reardon's fraudulent conduct was inextricably tied to his ownership of several businesses, the district court could find that "a reasonably direct relationship existed between" Reardon's offense conduct and his occupation as an owner of these businesses. U.S.S.G. § 5F1.5(a)(1); see also United States v. Turner, 88 F. App'x 307, 314 (10th Cir. 2004) (unpublished) (finding reasonably direct relationship between defendant's bank fraud and restricting his self-employment as a roofer because he used his roofing business to facilitate the fraud and, after initial sentence, failed to provide information about his business activities to probation officer).

Reardon's reliance on United States v. Farmer, 755 F.3d 849 (7th Cir. 2014), where the connection between the occupational restriction and the offense conduct was far more tenuous, is therefore misplaced. In Farmer, the district court imposed a self-employment ban on a defendant who attempted to extort a casino employee with "information from a golfing and gambling companion." 755 F.3d at 850-51. The U.S. Court of Appeals for the Seventh Circuit vacated the condition because "[t]he district court did not determine that [the defendant]'s activities as a self-employed entrepreneur caused him to attempt to extort [the victim]" and "focused instead on its belief that [the defendant]'s lack of success as an entrepreneur was causing him to turn to con

activities to fund himself." Id. at 855. Here, as we have just explained, Reardon's status as a business owner was central to and inseparable from his bank fraud. Thus, the district court could have found there was "reason to believe" that Reardon would engage in similar unlawful conduct if he were not subject to some restriction on his occupation during supervised release. See U.S.S.G. § 5F1.5(a)(2).

### 2. Whether the Self-Employment Ban Was the Minimum Restriction Necessary to Protect the Public

The record is silent, however, as to whether the district court determined that the ban was the minimum restriction necessary to protect the public, as section 5F1.5(b) requires. The government and the dissent suggest that we can infer the analysis occurred and affirm, but we disagree for three reasons. First, the district court never mentioned the substantive requirements of section 5F1.5(b). Second, we cannot infer the court's reasoning from the parties' arguments at sentencing or the PSR, as the government conceded that a narrower restriction would be reasonable and the PSR never cited section 5F1.5(b), discussed the heightened standard for occupational restrictions, or otherwise grappled with whether a total self-employment ban was the "minimum" restriction necessary. To the contrary, the record suggests that the probation officer urged the broadest possible restriction as a precautionary measure. Finally, the government points to the

possibility that the district court may in the future modify -- and, in doing so, more narrowly tailor -- the self-employment ban, but that fact has no bearing on the validity of the ban as it stands now.

To begin, the district court did not discuss section 5F1.5(b) or otherwise analyze why this broad ban was the "minimum" restriction necessary. Notably, although the court offered some reasoning for the ban, it did not explain its rationale for imposing a restriction that prohibited Reardon not only from owning any business but also from engaging in any form of self-employment. For instance, Reardon specifically highlighted at the sentencing hearing his ability to earn rental income from apartments he managed under a lease-to-own arrangement and how he had used the income to begin his restitution payments.[8] It appears that the ban would prohibit even this limited form of self-employment. The only explanation by the court for declining to narrow the ban was that it believed a complete ban would be "the more cautious approach," considering Reardon's offense conduct and pretrial release violation.

But the pretrial release condition that Reardon violated was not an occupational restriction. Instead, it was a limitation

_____

[8] The dissent briefly acknowledges this argument by Reardon in its discussion of the options proposed to the district court, see Dissent at 29, but, unlike us, equates this option with no self-employment restriction at all.

- 21 -

on applying for pandemic-related aid without prior approval from the probation office. Although the district court was surely correct in taking into account Reardon's violation of the pretrial condition in setting his sentence, a sufficient gap exists between no occupational restriction and a complete ban on all forms of self-employment (the only type of work Reardon had engaged in for more than two decades) to give us pause. Given that the district court never mentioned the heightened requirements for occupational restrictions, its statement that this broad ban was the more "cautious approach" is not enough for us to conclude that it engaged in the analysis required by section 5F1.5(b) -- whether the total ban was the minimum restriction necessary.[9]

Next, having found no discussion by the district court of section 5F1.5(b)'s requirements, we turn to whether the record permits us to infer the court's reasoning on this score. The government, notably, did not argue that the self-employment ban was necessary and instead suggested a "middle ground" in which the

-----

[9] The dissent suggests that, because Reardon used one of his businesses to skirt the restrictions of his pretrial release, it was reasonable for the district court to adopt a more cautious approach going forward. See Dissent at 30-31. We in no way question the district court's caution and agree that it was entirely reasonable. But a more cautious approach does not mandate an all-out ban. The court's well-supported decision to take into account Reardon's pretrial release violation in crafting his sentence does not change the fact that there is no consideration in the record of whether this complete ban was "the minimum [restriction] necessary to protect the public," as section 5F1.5(b) instructs.

- 22 -

"condition at least could be caveated appropriately to . . . [avoid] a writ large prohibition against self-employment." Thus, the government's statements at the sentencing hearing offer no support for why the total ban was the minimum restriction necessary.[10] Additionally, the PSR suggested that the restriction was "appropriate" because "[p]rohibiting self-employment reduces the risk of [Reardon] engaging [in] criminal business practices and increases the likelihood of the restitution being paid in a timely fashion." But this rationale only goes to the point that the ban would protect the public; it does not support a finding that the total ban is the <u>minimum</u> restriction necessary to do so. Those are two entirely separate inquiries, and there is no evidence the second inquiry was ever conducted here. Indeed, the PSR does not reference section 5F1.5(b), and there is no other indication that the probation officer considered its requirements.

The government maintains that the court's reasoning for the total self-employment ban is evident from the record, as "the

---

[10] The dissent maintains that the district court's decision to reject the government's alternative cannot be an abuse of discretion on this record. <u>See</u> Dissent at 30-31. Again, we agree that the district court was well within its discretion to conclude that a stricter approach was necessary. But section 5F1.5(b) requires, without exception or reservation, that the court restrict a defendant's occupation to the "<u>minimum</u> extent necessary to protect the public." U.S.S.G. § 5F1.5(b) (emphasis added). The record only indicates why something more than the pretrial release conditions was needed here; it does not explain why this total ban is the <u>minimum</u> restriction that would suffice, which is a separate inquiry.

court's sentencing comments as a whole suggest a substantial concern regarding Reardon's risk of recidivism and the need to protect the public from that possibility." For example, the government explains, when the court set forth its "key findings regarding the nature and circumstances of the offense," it characterized Reardon's offense as "a fundamental breach of the public trust at a time of a public emergency." It also expressed the need for the sentence "to deter [Reardon] from committing future crimes," suggesting that Reardon's violation of his pretrial release conditions called into question his ability to "maintain a law-abiding lifestyle." These statements support a conclusion that Reardon might reoffend and, therefore, some occupational restriction would be reasonably necessary to protect the public. But, again, they do not explain why such a broad ban was the minimum restriction that would do.

Finally, we cannot conclude, as the government suggests, that the district court's reminder that Reardon is free to file a motion to modify the conditions of supervised release after he finishes his prison term explains this broad ban. "[I]n light of [Reardon's] offenses," the government adds, "the requirement that he be subject to oversight in his employment while on supervised release is proportionate and reasonable." But the self-employment restriction as it stands now does not provide "oversight" of Reardon's employment. Unlike those conditions that "simply

require preapproval from probation" or the court, the restriction here is "a flat ban." McCullock, 991 F.3d at 322. That the district court may ultimately modify the ban to permit self-employment with such oversight has no bearing on whether the current ban satisfies the statutory requirements. As we have previously pointed out, "[t]o approve problematic conditions because a judge or a probation officer might, in her or his discretion, relax them in the future, undermines the command to sentencing courts to not deprive offenders of more liberty than is necessary to carry out the goals of supervised release." United States v. Ramos, 763 F.3d 45, 61 (1st Cir. 2014).

The government's comparison of this case to United States v. Carpenter, 280 F. App'x 866 (11th Cir. 2008) is therefore inapt. The condition in Carpenter permitted the defendant to enter into self-employment with "prior written permission of the court." 280 F. App'x at 867. The condition did not, as is the case here, categorically prohibit the defendant from self-employment. See id. at 870 (concluding that condition requiring defendant to obtain approval for future self-employment "involve[d] no great deprivation of liberty because [the defendant could] obtain court approval for legitimate self-employment"); see also United States v. Mercado, 777 F.3d 532, 539 (1st Cir. 2015) (finding it "[i]mportant[]" that a condition was not "an outright ban" and instead "merely require[d] . . . pre-approv[al] by the probation

officer").  Because the total self-employment ban is not "subject to supervision by the probation officer," there is no "safeguard" permitting Reardon to "petition the district court to modify the condition in the event that approval has been unreasonably withheld."  Pabon, 819 F.3d at 32; see United States v. DaSilva, 844 F.3d 8, 14 (1st Cir. 2016) ("[G]iving the probation officer some authority to make exceptions as warranted is generally seen as a benefit of such orders in that it allows for flexibility and permits personal circumstances to be dealt with as they arise."); see also United States v. Fey, 834 F.3d 1, 6 (1st Cir. 2016) (upholding condition imposed without "express explanation" that required defendant to "seek approval from probation before accepting a job or volunteer activity that would bring him into direct contact with minors").

To wrap up our discussion, we briefly address two other out-of-circuit decisions that the government highlights, one of which is also cited by the dissent.  See United States v. Choate, 101 F.3d 562, 566-67 (8th Cir. 1996) (upholding self-employment ban); United States v. Turner, 88 F. App'x 307, 314-15 (10th Cir. 2004) (unpublished) (same).  Critically, although Choate and Turner involved analogous facts, neither addressed whether the self-employment ban imposed was the minimum restriction necessary to protect the public under section 5F1.5(b).  We are therefore not persuaded that these two cases are instructive here.

"A district court's duty to specifically find that [an occupational] restriction is minimally restrictive is 'mandatory.'" United States v. Butler, 694 F.3d 1177, 1184 (10th Cir. 2012) (citation omitted); see U.S.S.G. § 5F1.5(b) ("[T]he court shall impose the condition for the minimum time and to the minimum extent necessary to protect the public." (emphasis added)). Further, we are obligated to evaluate if the occupational restriction here satisfies the statutory requirements. See Benoit, 975 F.3d at 26. Based on this record, we cannot be certain that the district court considered whether the total self-employment ban was the minimum restriction necessary and thus cannot evaluate its analysis for imposing the ban.

We therefore vacate the self-employment ban and remand to the district court for resentencing limited to a reexamination of the scope of that restriction. See Perazza-Mercado, 553 F.3d at 75 ("[W]here we are unable, through our own examination of the record, to discern the court's reasoning, 'it is incumbent upon us to vacate . . . .'" (citation omitted)). To be clear, nothing in our decision prohibits the re-imposition of an occupational restriction on remand that satisfies section 5F1.5's requirements.

## III. CONCLUSION

For these reasons, we **vacate** the self-employment ban (special condition six) and **remand** for resentencing limited to a re-examination of that condition.

**-Dissenting Opinion Follows-**

**KAYATTA**, <u>Circuit Judge</u>, **dissenting.** I respectfully dissent. I would find that the district court did not abuse its ample discretion in adopting a supervised release condition that closely corresponded to the nature of Reardon's crime -- repeated fraud motivated by a history of failed business ventures.

The majority five-times stresses that the district court neither cited nor expressly applied U.S.S.G. § 5F1.5(b)'s requirement that an occupational restriction be minimally necessary to protect the public. But the majority concedes that we may infer the district court's reasoning "by comparing what was argued . . . [or what was] in the pre-sentence report with what the judge did." <u>United States</u> v. <u>Colón-Cordero</u>, 91 F.4th 41, 53 (1st Cir. 2024). And on this record, we can easily infer that the district court concluded that the self-employment restriction was minimally necessary to protect the public.

The parties presented the district court with three alternatives: no occupational restriction at all (Reardon's proposal); a self-employment restriction that the Probation Office could modify on an ad hoc basis (the government's middle-ground suggestion); and a complete self-employment restriction (the Probation Office's proposal). As an example of potential self-employment in the absence of any restriction, Reardon pointed to managing apartment buildings that he owned. The court asked counsel to address these alternatives. After hearing out counsel,

- 29 -

the court found that some form of occupational restriction was necessary, adopting the reasoning set forth in the pre-sentence report ("PSR"). Even the majority concedes that the record supported this conclusion. So, Reardon's proposed "no restriction" alternative was out.

The court also explained why a middle-ground alternative, such as the one proposed by the government, was also out. First, as the PSR noted, Reardon's self-employment risked the type of financial losses that had, in the past, motivated his fraud. A middle-ground approach that still allowed some self-employment would not alleviate this concern at all. Second, the district court noted that the "travel" of the case counseled against a middle-ground approach. After his first indictment, Reardon convinced the court to release him on bail, subject to a condition barring him from seeking further pandemic-related assistance without Probation Office approval. He then promptly violated that condition. He used the proceeds of his prior fraud to establish a Florida-based limited liability company -- which had no authority to conduct business in Maine -- to apply for pandemic-related rental assistance. Thus, the court reasonably concluded that giving Reardon similar leeway the second time around would likely endanger the public.

My colleagues appear bothered by the court's caution. But the district court's point was simple and obvious: Given

Reardon's remarkable post-arraignment record of skirting court supervision and filing dubious applications for government assistance, a more cautious approach was necessary to protect the public during Reardon's supervised release. I cannot see how this approach was an abuse of discretion, especially when crafting a sentence that would have Reardon back on the street within two years.[11]

In short, the district court's reasoning justified rejecting the alternatives proposed by the government and by Reardon. That left only the self-employment ban proposed by the Probation Office. The district court had no obligation to consider additional alternatives that no one proposed. See United States v. Choate, 101 F.3d 562, 566 (8th Cir. 1996) (affirming a broad ban on self-employment, while stating that "[t]he district court is not required to pit its imagination against [the defendant's] to anticipate what sort of business [the defendant] could put to fraudulent use"). Therefore, the Probation Office's alternative was -- among the options proposed -- the one that was minimally necessary to protect the public.

---

[11] The majority's rejoinder that Reardon's pre-trial release condition was "not an occupational restriction" misses the point. What matters is that Reardon had a track record of flouting supervision while on release. Given this past behavior, the court reasonably found that the government's middle-ground alternative -- which provided no standards for assessing Reardon's proposed exceptions to the self-employment ban -- would not sufficiently protect the public.

And even if further justification for the complete self-employment ban were required, the district court also defended the ban against Reardon's objections. For instance, Reardon noted that a complete self-employment ban would bar him from managing his apartment buildings and generating funds for restitution. But the PSR reasonably concluded that Reardon -- whose entrepreneurial track record was spotty at best -- was more likely to pay restitution in a "timely fashion" if he worked for a third party and earned a steady wage.

Reardon clearly had difficulties working for himself without a reliable wage. And he had difficulty avoiding the temptation to use his businesses to perpetuate fraud. So, on this record, the district court did not abuse its considerable discretion in deciding that Reardon's post-imprisonment transition to civil society should begin with a reliable and steady wage-paying job, which he would find harder to turn into an incentive or a vehicle for further fraud. Because the majority gives too little deference to the district court's reasoned justification for the self-employment ban, I respectfully dissent.